Justice Breyer
delivered the opinion of the Court.
The Federal Communications Commission (Commission or FCC) has established rules that require long-distance (and certain other) communications carriers to compensate a payphone operator when a caller uses a payphone to obtain free access to the carrier’s lines (by dialing, e. g., a 1-800 number or other access code). The Commission has added that a carrier’s refusal to pay the compensation is a “practice . . . that is unjust or unreasonable” within the terms of the Communications Act of 1934, § 201(b), 48 Stat. 1070, 47 U. S. C. § 201(b). Communications Act language links § 201(b) to § 207, which authorizes any person “damaged” by a violation of § 201(b) to bring a lawsuit to recover damages in federal court. And we must here decide whether this linked section, §207, authorizes a payphone operator to bring a federal-court lawsuit against a recalcitrant carrier that refuses to pay the compensation that the Commission’s order says it owes.
In our view, the FCC’s application of § 201(b) to the carrier’s refusal to pay compensation is a reasonable interpreta *48 tion of the statute; hence it is lawful. See Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 843-844, and n. 11 (1984). And, given the linkage with §207, we also conclude that §207 authorizes this federal-court lawsuit.
I
A
Because regulatory history helps to illuminate the proper interpretation and application of §§ 201(b) and 207, we begin with that history. When Congress enacted the Communications Act of 1934, it granted the FCC broad authority to regulate interstate telephone communications. See Louisiana Pub. Serv. Comm’n v. FCC, 476 U. S. 355, 360 (1986). The Commission, during the first several decades of its history, used this authority to develop a traditional regulatory system much like the systems other commissions had applied when regulating railroads, public utilities, and other common carriers. A utility or carrier would file with a commission a tariff containing rates, and perhaps other practices, classifications, or regulations in connection with its provision of communications services. The commission would examine the rates, etc., and, after appropriate proceedings, approve them, set them aside, or, sometimes, set forth a substitute rate schedule or list of approved charges, classifications, or practices that the carrier or utility must follow. In doing so, the commission might determine the utility’s or carrier’s overall costs (including a reasonable profit), allocate costs to particular services, examine whether, and how, individual rates would generate revenue that would help cover those costs, and, if necessary, provide for a division of revenues among several carriers that together provided a single service. See 47 U. S. C. §§ 201(b), 203, 205(a); Missouri ex rel. Southwestern Bell Telephone Co. v. Public Serv. Comm’n of Mo., 262 U. S. 276, 291-295 (1923) (Brandeis, J., concurring in judgment) (telecommunications); Verizon Communications *49 Inc. v. FCC, 535 U. S. 467, 478 (2002) (same); Chicago & North Western R. Co. v. Atchison, T. & S. F. R. Co., 387 U. S. 326, 331 (1967) (railroads); Permian Basin Area Rate Cases, 390 U.S. 747, 761-765, 806-808 (1968) (natural gas field production).
In authorizing this traditional form of regulation, Congress copied into the 1934 Communications Act language from the earlier Interstate Commerce Act of 1887, 24 Stat. 379, which (as amended) authorized federal railroad regulation. See American Telephone & Telegraph Co. v. Central Office Telephone, Inc., 524 U. S. 214, 222 (1998). Indeed, Congress largely copied §§ 1,8, and 9 of the Interstate Commerce Act when it wrote the language of Communications Act §§ 201(b) and 207, the sections at issue here. The relevant sections (in both statutes) authorize the Commission to declare any carrier “charge,” “regulation,” or “practice” in connection with the carrier’s services to be “unjust or unreasonable”; they declare an “unreasonable,” e. g., “charge” to be “unlawful”; they authorize an injured person to recover “damages” for an “unlawful” charge or practice; and they state that, to do so, the person may bring suit in a “court” “of the United States.” Interstate Commerce Act §§ 1,8, 9, 24 Stat. 379, 382; Communications Act §§ 201(b), 206, 207, 48 Stat. 1070, 1072, 1073, 47 U. S. C. §§ 201(b), 206, 207.
Historically speaking, the Interstate Commerce Act sections changed early, preregulatory common-law rate-supervision procedures. The common law originally permitted a freight shipper to ask a court to determine whether a railroad rate was unreasonably high and to award the shipper damages in the form of “reparations.” The “new” regulatory law, however, made clear that a commission, not a court, would determine a rate’s reasonableness. At the same time, that “new” law permitted a shipper injured by an unreasonable rate to bring a federal lawsuit to collect damages. Interstate Commerce Act §§ 1, 8-9; Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 284 U. S. 370, 383-386 *50 (1932); Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 436, 440-441 (1907); Keogh v. Chicago & Northwestern R. Co., 260 U. S. 156, 162 (1922); Louisville & Nashville R. Co. v. Ohio Valley Tie Co., 242 U. S. 288, 290-291 (1916); J. Ely, Railroads and American Law 71-72, 226-227 (2001); A. Hoogenboom & O. Hoogenboom, A History of the ICC 61 (1976). The similar language of Communications Act §§ 201(b) and 207 indicates a roughly similar sharing of agency authority with federal courts.
Beginning in the 1970’s, the FCC came to believe that communications markets might efficiently support more than one firm and that competition might supplement (or provide a substitute for) traditional regulation. See MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U. S. 218, 220-221 (1994). The Commission facilitated entry of new telecommunications carriers into long-distance markets. And in the 1990’s, Congress amended the 1934 Act while also enacting new telecommunications statutes, in order to encourage (and sometimes to mandate) new competition. See Telecommunications Act of 1996, 110 Stat. 56, 47 U. S. C. § 609 et seq. Neither Congress-nor the Commission, however, totally abandoned traditional regulatory requirements. And the new statutes and amendments left many traditional requirements and related statutory provisions, including §§ 201(b) and 207, in place. E. g., National Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 975 (2005).
B
The regulatory problem that underlies this lawsuit arises at the intersection of traditional regulation and newer, more competitively oriented approaches. Competing long-distance carriers seek the business of individual local callers, including those who wish to make a long-distance call from a local payphone. A payphone operator, however, controls what is sometimes a necessary channel for the caller to reach the long-distance carrier. And prior to 1990, a payphone op *51 erator, exploiting this control, might require a caller to use a long-distance carrier that the operator favored while blocking access to the caller’s preferred carrier. Such a practice substituted the operator’s choice of carrier for the caller’s, and it potentially placed disfavored carriers at a competitive disadvantage. In 1990, Congress enacted special legislation requiring payphone operators to allow a payphone user to obtain “free” access to the carrier of his or her choice, i. e., access from the payphone without depositing coins. Telephone Operator Consumer Services Improvement Act of 1990, 104 Stat. 986, note following 47 U. S. C. §226. (For ease of exposition, we often use familiar terms such as “long distance” and “free” calls instead of more precise terms such as “interexchange” and “coinless” or “dial-around” calls.)
At the same time, Congress recognized that the “free” call would impose a cost upon the payphone operator; and it consequently required the FCC to “prescribe regulations that... establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call.” § 276(b)(1)(A) of the Communications Act of 1934, as added by § 151 of the Telecommunications Act of 1996,110 Stat. 106, codified at 47 U. S. C. § 276(b)(1)(A).
The FCC then considered the compensation problem. Using traditional ratemaking methods, it found that the (fixed and incremental) costs of a “free” call from a payphone to, say, a long-distance carrier warranted reimbursement of (at the time relevant to this litigation) $0.24 per call. The FCC ordered carriers to reimburse the payphone operators in this amount unless a carrier and an operator agreed upon a different amount. 47 CFR § 64.1300(d) (2005). At the same time, it left the carriers free to pass the cost along to their customers, the payphone callers. Thus, in a typical “free” call, the carrier will bill the caller and then must share the revenue the carrier receives — to the tune of $0.24 per call— with the payphone operator that has, together with the car *52 rier, furnished a communications service to the caller. The FCC subsequently determined that a carrier’s refusal to pay the compensation ordered amounts to an “unreasonable practice” within the terms of § 201(b). (We shall refer to these regulations as the Compensation Order and the 2003 Payphone Order, respectively. See Appendix A, infra, for full citations.) See generally P. Huber, M. Kellogg, & J. Thorne, Federal Telecommunications Law § 8.6.3, pp. 710-713 (2d ed. 1999) (hereinafter Huber). That determination, it believed, would permit a payphone operator to bring a federal-court lawsuit under § 207 to collect the compensation owed. 2003 Payphone Order, 18 FCC Red. 19975,19990, ¶ 32.
C
In 2003, respondent, Metrophones Telecommunications, Inc., a payphone operator, brought this federal-court lawsuit against Global Crossing Telecommunications, Inc., a long-distance carrier. Metrophones sought compensation that it said Global Crossing owed it under the FCC’s Compensation Order, 14 FCC Red. 2545 (1999). Insofar as is relevant here, Metrophones claimed that Global Crossing’s refusal to pay amounted to a violation of § 201(b), thereby permitting Metrophones to sue in federal court, under § 207, for the compensation owed. The District Court agreed. 423 F. 3d 1056, 1061 (CA9 2005). The Ninth Circuit affirmed the District Court’s determination. Ibid. We granted certiorari to determine whether §207 authorizes the lawsuit.
II
A
Section 207 says that “[a]ny person claiming to be damaged by any common carrier . .. may bring suit” against the carrier “in any district court of the United States” for “recovery of the damages for which such common carrier may be liable under the provisions of this chapter.” 47 U. S. C. §207 (emphasis added). This language makes clear that the lawsuit *53 is proper if the FCC could properly hold that a carrier’s failure to pay compensation is an “unreasonable practice” deemed “unlawful” under § 201(b). That is because the immediately preceding section, § 206, says that a common carrier is “liable” for “damages sustained in consequence of” the carrier’s doing “any act, matter, or thing in this chapter prohibited or declared to be unlawfulAnd § 201(b) declares “unlawful” any common-carrier “charge, practice, classification, or regulation that is unjust or unreasonable.” (See Appendix B, infra, for full text; emphasis added throughout.)
The history of these sections — including that of their predecessors, §§ 8 and 9 of the Interstate Commerce Act — simply reinforces the language, making clear the purpose of §207 is to allow persons injured by § 201(b) violations to bring federal-court damages actions. See, e. g., Arizona Grocery Co., 284 U. S., at 384-385 (Interstate Commerce Act §§8-9); Part I-A, supra. History also makes clear that the FCC has long implemented § 201(b) through the issuance of rules and regulations. This is obviously so when the rules take the form of FCC approval or prescription for the future of rates that exclusively are “reasonable.” See 47 U. S. C. § 205 (authorizing the FCC to prescribe reasonable rates and practices in order to preclude rates or practices that violate §201(b)); 5 U. S. C. §551(4) (“‘rule’. . . includes the approval or prescription for the future of rates ... or practices”). It is also so when the FCC has set forth rules that, for example, require certain accounting methods or insist upon certain carrier practices, while (as here) prohibiting others as unjust or unreasonable under § 201(b). See, e.g. (to name a few), Verizon Tel. Cos. v. FCC, 453 F. 3d 487, 494 (CADC 2006) (rates unreasonable (and hence unlawful) if not adjusted pursuant to accounting rules ordered in FCC regulations); Cable & Wireless P. L. C. v. FCC, 166 F. 3d 1224, 1231 (CADC 1999) (failure to follow Commission-ordered settlement practices unreasonable); MCI Telecommunications Corp. v. FCC, *54 59 F. 3d 1407, 1414 (CADC 1995) (violation of rate-of-return prescription unlawful); In re NOS Communications, Inc., 16 FCC Red. 8133, 8136, ¶ 6 (2001) (deceptive marketing an unreasonable practice); In re Promotion of Competitive Networks in Local Telecommunications Markets, 15 FCC Red. 22983, 23000, ¶ 35 (2000) (entering into exclusive contracts with commercial building owners an unreasonable practice).
Insofar as the statute’s language is concerned, to violate a regulation that lawfully implements §201(b)’s requirements is to violate the statute. See, e. g., MCI Telecommunications Corp., 59 F. 3d, at 1414 (“We have repeatedly held that a rate-of-return prescription has the force of law and that the Commission may therefore treat a violation of the prescription as a per se violation of the requirement of the Communications Act that a common carrier maintain ‘just and reasonable’ rates, see 47 U. S. C. § 201(b)”); cf. Alexander v. Sandoval, 532 U. S. 275, 284 (2001) (it is “meaningless to talk about a separate cause of action to enforce the regulations apart from the statute”). That is why private litigants have long assumed that they may, as the statute says, bring an action under § 207 for violation of a rule or regulation that lawfully implements § 201(b). See, e. g., Oh v. AT&T Corp., 76 F. Supp. 2d 551, 556 (NJ 1999) (assuming validity of § 207 suit alleging violation of § 201(b) in carrier’s failure to provide services listed in FCC-approved tariff); Southwestern Bell Tel. Co. v. Allnet Communications Servs., Inc., 789 F. Supp. 302, 304-306 (ED Mo. 1992) (assuming validity of § 207 suit to enforce FCC’s determination of reasonable practices related to payment of access charges by long-distance carrier to local exchange carrier); cf., e. g., Chicago & North Western Transp. Co. v. Atchison, T. & S. F. R. Co., 609 F. 2d 1221, 1224-1225 (CA7 1979) (same in respect to Interstate Commerce Act equivalents of §§ 201(b), 207).
The difficult question, then, is not whether §207 covers actions that complain of a violation of § 201(b) as lawfully implemented by an FCC regulation. It plainly does. It re *55 mains for us to decide whether the particular FCC regulation before us lawfully implements § 201(b)’s “unreasonable practice” prohibition. We now turn to that question.
B
In our view the FCC’s § 201(b) “unreasonable practice” determination is a reasonable one; hence it is lawful. See Chevron U. S. A. Inc., 467 U. S., at 843-844. The determination easily fits within the language of the statutory phrase. That is to say, in ordinary English, one can call a refusal to pay Commission-ordered compensation despite having received a benefit from the payphone operator a “practic[e]... in connection with [furnishing a] communication service .. . that is . . . unreasonable.” The service that the payphone operator provides constitutes an integral part of the total long-distance service the payphone operator and the long-distance carrier together provide to the caller, with respect to the carriage of his or her particular call. The carrier’s refusal to divide the revenues it receives from the caller with its collaborator, the payphone operator, despite the FCC’s regulation requiring it to do so, can reasonably be called a “practice” “in connection with” the provision of that service that is “unreasonable.” Cf. post, p. 74 (Thomas, J., dissenting).
Moreover, the underlying regulated activity at issue here resembles activity that both transportation and communications agencies have long regulated. Here the agency has determined through traditional regulatory methods the cost of carrying a portion (the payphone portion) of a call that begins with a caller and proceeds through the payphone, attached wires, local communications loops, and long-distance lines to a distant call recipient. The agency allocates costs among the joint providers of the communications service and requires downstream carriers, in effect, to pay an appropriate share of revenues to upstream payphone operators. Traditionally, the FCC has determined costs of *56 some segments of a call while requiring providers of other segments to divide related revenues. See, e. g., Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 148-151 (1930) (communications). And traditionally, transportation agencies have determined costs of providing some segments of a larger transportation service (for example, the cost of providing the San Franciseo-Ogden segment of a San Francisco-New York shipment) while requiring providers of other segments to divide revenues. See, e. g., New England Divisions Case, 261 U. S. 184 (1923); Chicago & North Western R. Co., 387 U. S. 326; cf. Cable & Wireless R L. C, 166 F. 3d, at 1231. In all instances an agency allocates costs and provides for a related sharing of revenues.
In these more traditional instances, transportation carriers and communications firms entitled to revenues under rate divisions or cost allocations might bring lawsuits under § 207, or the equivalent sections of the Interstate Commerce Act, and obtain compensation or damages. See, e. g., Allnet Communication Serv., Inc. v. National Exch. Carrier Assn., Inc., 965 F. 2d 1118, 1122 (CADC 1992) (§207); Southwestern Bell Tel. Co., supra, at 305 (same); Chicago & North Western Transp. Co., supra, at 1224-1225 (Interstate Commerce Act equivalent of § 207). Again, the similarities support the reasonableness of an agency’s bringing about a similar result here. We do not suggest that the FCC is required to find carriers’ failures to divide revenues to be § 201(b) violations in every instance. Cf. U. S. Telepacific Corp. v. Tel-America of Salt Lake City, Inc., 19 FCC Rcd. 24552, 24555-24556, and n. 27 (2004) (citing cases). Nor do we suggest that every violation of FCC regulations is an unjust and unreasonable practice. Here there is an explicit statutory scheme, and compensation of payphone operators is necessary to the proper implementation of that scheme. Under these circumstances, the FCC’s finding that the failure to follow the order is an unreasonable practice is well within its authority.
*57 There are, of course, differences between the present “unreasonable practice” classification and the similar more traditional regulatory subject matter we have just described. For one thing, the connection between payphone operators and long-distance carriers is not a traditional “through route” between carriers. See § 201(a). For another, as Global Crossing’s amici point out, the word “practice” in § 201(b) has traditionally applied to a carrier practice that (unlike the present one) is the subject of a carrier tariff— i. e., a carrier agency filing that sets forth the carrier’s rates, classifications, and practices. Brief for AT&T et al. as Amici Curiae 8-11. We concede the differences. Indeed, traditionally, the filing of tariffs was “the centerpiece” of the “[Communications] Act’s regulatory scheme.” MCI Telecommunications Corp., 512 U. S., at 220. But we do not concede that these differences require a different outcome. Statutory changes enhancing the role of competition have radically reduced the role that tariffs play in regulatory supervision of what is now a mixed communications system— a system that relies in part upon competition and in part upon more traditional regulation. Yet when Congress rewrote the law to bring about these changes, it nonetheless left § 201(b) in place. That fact indicates that the statute permits, indeed it suggests that Congress likely expected, the FCC to pour new substantive wine into its old regulatory bottles. See Policy and Rules Concerning the Interstate, Interexchange Marketplace, 12 FCC Red. 15014, 15057, ¶ 77 (1997) (despite the absence of tariffs, FCC’s §201 enforcement obligations have not diminished); Boomer v. AT&T Corp., 309 F. 3d 404, 422 (CA7 2002) (same). And this circumstance, by indicating that Congress did not forbid the agency to apply § 201(b) differently in the changed regulatory environment, is sufficient to convince us that the FCC’s determination is lawful.
That is because we have made clear that where “Congress would expect the agency to be able to speak with the force *58 of law when it addresses ambiguity in the statute or fills a space in the enacted law,” a court “is obliged to accept the agency’s position if Congress has not previously spoken to the point at issue and the agency’s interpretation” (or the manner in which it fills the “gap”) is “reasonable.” United States v. Mead Corp., 533 U. S. 218, 229 (2001); National Cable & Telecommunications Assn., 545 U. S., at 980; Chevron U. S. A. Inc., 467 U. S., at 843-844. Congress, in § 201(b), delegated to the agency authority to “fill” a “gap,” i. e., to apply §201 through regulations and orders with the force of law. National Cable & Telecommunications Assn., supra, at 980-981. The circumstances mentioned above make clear the absence of any relevant congressional prohibition. And, in light of the traditional regulatory similarities that we have discussed, we can find nothing unreasonable about the FCC’s § 201(b) determination.
C
Global Crossing, its supporting amici, and the dissents make several additional but ultimately unpersuasive arguments. First, Global Crossing claims that §207 authorizes only actions “seeking damages for statutory violations” and not for “violations merely of regulations promulgated to carry out statutory objectives.” Brief for Petitioner 12 (emphasis in original). The lawsuit before us, however, “seek[s] damages for [a] statutory violatio[n],” namely, a violation of §201(b)’s prohibition of an “unreasonable practice.” As we have pointed out, supra, at 53-54, §201(b)’s prohibitions have long been thought to extend to rates that diverge from FCC prescriptions, as well as rates or practices that are “unreasonable” in light of their failure to reflect rules embodied in an agency regulation. We have found no limitation of the kind Global Crossing suggests.
Global Crossing seeks to draw support from Alexander v. Sandoval, 532 U. S. 275 (2001), and Adams Fruit Co. v. Bar *59 rett, 494 U. S. 638 (1990), which, Global Crossing says, hold that an agency cannot determine through regulation when a private party may bring a federal court action. Those cases do involve private actions, but they do not support Global Crossing. The cases involve different statutes and different regulations, and the Court made clear in each of those cases that its holding relied on the specific statute before it. In Sandoval, supra, at 288-289, the Court found that an implied right of action to enforce one statutory provision, 42 U. S. C. §2000d, did not extend to regulations implementing another, §2000d-l. In contrast, here we are addressing the FCC’s reasonable interpretation of ambiguous language in a substantive statutory provision, 47 U. S. C. § 201(b), which Congress expressly linked to the right of action provided in §207. Nothing in Sandoval requires us to limit our deference to the FCC’s reasonable interpretation of § 201(b); to the contrary, as we noted in Sandoval, it is “meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.” 532 U. S., at 284. In Adams Fruit Co., supra, at 646-647, we rejected an agency interpretation of the worker-protection statute at issue as contrary to “the plain meaning of the statute’s language.” Given the differences in statutory language, context, and history, those two cases are simply beside the point.
Our analysis does not change in this case simply because the practice deemed unreasonable (and hence unlawful) in the 2003 Payphone Order is in violation of an FCC regulation adopted under authority of a separate statutory section, §276. The FCC here, acting under the authority of §276, has prescribed a particular rate (and a division of revenues) applicable to a portion of a long-distance service, and it has ordered carriers to reimburse payphone operators for the *60 relevant portion of the service they jointly provide. But the conclusion that it is “unreasonable” to fail so to reimburse is not a § 276 conclusion; it is a § 201(b) conclusion. And courts have treated a carrier’s failure to follow closely analogous agency rate and rate-division determinations as we treat the matter at issue here. That is to say, the FCC properly implements § 201(b) when it reasonably finds that the failure to follow a Commission, e. g., rate or rate-division determination made under a different statutory provision is unjust or unreasonable under § 201(b). See, e.g., MCI Telecommunications Corp., 59 F. 3d, at 1414 (failure to follow a rate promulgated under §205 properly considered unreasonable under § 201(b)); see also Baltimore & O. R. Co. v. Alabama Great Southern R. Co., 506 F. 2d 1265, 1270 (CADC 1974) (statutory obligation to provide reasonable rate divisions is “implemented by orders of the ICC” issued pursuant to a separate statutory provision). Moreover, in resting our conclusion upon the analogy with rate setting and rate divisions, the traditional, historical subject matter of § 201(b), we avoid authorizing the FCC to turn §§ 201(b) and 207 into a backdoor remedy for violation of FCC regulations.
Second, Justice Scalia, dissenting, says that the “only serious issue presented by this case [is] whether a practice that is not in and of itself unjust or unreasonable can be rendered such (and thus rendered in violation of the Act itself) because it violates a substantive regulation of the Commission.” Post, at 68. He answers this question “no,” because, in his view, a “violation of a substantive regulation promulgated by the Commission is not a violation of the Act, and thus does not give rise to a private cause of action.” Post, at 69. We cannot accept either Justice Scalia’s statement of the “serious issue” or his answer.
We do not accept his statement of the issue because whether the practice is “in and of itself” unreasonable is irrelevant. The FCC has authoritatively ruled that carriers *61 must compensate payphone operators. The only practice before us, then, and the only one we consider, is the carrier’s violation of that FCC regulation requiring the carrier to pay the payphone operator a fair portion of the total cost of carrying a call that they jointly carried — each supplying a partial portion of the total carriage. A practice of violating the FCC’s order to pay a fair share would seem fairly characterized in ordinary English as an “unjust practice,” so why should the FCC not call it the same under § 201(b)?
Nor can we agree with Justice Scalia’s claim that a “violation of a substantive regulation promulgated by the Commission is not a violation of” § 201(b) of the Act when, as here, the Commission has explicitly and reasonably ruled that the particular regulatory violation does violate § 201(b). (Emphasis added.) And what has the substantive/interpretive distinction that Justice Scalia emphasizes, ibid., to do with the matter? There is certainly no reference to this distinction in § 201(b); the text does not suggest that, of all violations of regulations, only violations of interpretive regulations can amount to unjust or unreasonable practices. Why believe that Congress, which scarcely knew of this distinction a century ago before the blossoming of administrative law, would care which kind of regulation was at issue? And even if this distinction were relevant, the FCC has long set forth what we now would call “substantive” (or “legislative”) rules under §205. Cf. 1 R. Pierce, Administrative Law Treatise §6.4, p. 325 (4th ed. 2002); post, at 70. And violations of those substantive § 205 regulations have clearly been deemed violations of § 201(b). E. g., MCI Telecommunications Corp., 59 F. 3d, at 1414. Conversely, we have found no case at all in which a private plaintiff was kept out of federal court because the § 201(b) violation it challenged took the form of a “substantive regulation” rather than an “interpretive regulation.” Insofar as Justice Scalia uses adjectives such as “traditional” or “textually based” to de *62 scribe his distinctions, post, at 71, and “novel” or “absurd” to describe ours, post, at 72, 68, we would simply note our disagreement.
We concede that Justice Scalia cites three sources in support of his theory. See post, at 69-70. But, in our view, those sources offer him no support. None of those sources involved an FCC application of, or an FCC interpretation of, the section at issue here, namely, § 201(b). Nor did any involve a regulation—substantive or interpretive—promulgated subsequent to the authority of § 201(b). Thus none is relevant to the case at hand. See APCC Servs., Inc. v. Sprint Communications Co., 418 F. 3d 1238, 1247 (CADC 2005) (per curiam) (“There was no authoritative interpretation of § 201(b) in this case”), cert. pending, No. 05-766; Greene v. Sprint Communications Co., 340 F. 3d 1047, 1052 (CA9 2003) (violation of substantive regulation does not violate §276; silent as to § 201(b)). The single judge who thought that the FCC had authoritatively interpreted § 201(b) (as has occurred in the case before us) would have reached the same conclusion that we do. APCC Servs., Inc., supra, at 1254 (D. H. Ginsburg, C. J., dissenting) (finding a private cause of action, because there was “clearly an authoritative interpretation of § 201(b)” that deemed the practice in question unlawful). See also Huber §3.14.3, p. 317 (no discussion of § 201(b)).
Third, Justice Thomas (who also does not adopt Justice Scalia’s arguments) disagrees with the FCC’s interpretation of the term “practice.” He, along with Global Crossing, claims instead that §§ 201(a) and (b) concern only practices that harm carrier customers, not carrier suppliers. Post, at 67-70 (Scalia, J., dissenting); Brief for Petitioner 37-38. But that is not what those sections say. Nor does history offer this position significant support. A violation of a regulation or order dividing rates among railroads, for example, would *63 likely have harmed another carrier, not a shipper. See, e. g., Chicago & North Western Transp. Co., 609 F. 2d, at 1225, 1226 (“Act . . . provides for the regulation of inter-carrier relations as a part of its general rate policy”). Once one takes account of this fact, it seems reasonable, not unreasonable, to include as a § 201(b) (and § 207) beneficiary a firm that performs services roughly analogous to the transportation of one segment of a longer call. We are not here dealing with a firm that supplies office supplies or manual labor. Cf., e. g., Missouri Pacific R. Co. v. Norwood, 283 U. S. 249, 257 (1931) (“practice” in § 1 of the Interstate Commerce Act does not encompass employment decisions). The long-distance carrier ordered by the FCC to compensate the payphone operator is so ordered in its role as a provider of communications services, not as a consumer of office supplies or the like. It is precisely because the carrier and the payphone operator jointly provide a communications service to the caller that the carrier is ordered to share with the payphone operator the revenue that only the carrier is permitted to demand from the caller. Cf. Cable & Wireless P. L. C., 166 F. 3d, at 1231 (finding that § 201(b) enables the Commission to regulate not “only the terms on which U. S. carriers offer telecommunication services to the public,” but also “the prices U. S. carriers pay” to foreign carriers providing the foreign segment of an international call).
Fourth, Global Crossing argues that the FCC’s “unreasonable practice” determination is unlawful because it is inadequately reasoned. We concede that the FCC’s initial opinion simply states that the carrier’s practice is unreasonable under § 201(b). But the context and cross-referenced opinions, 2003 Payphone Order, 18 FCC Red., at 19990, ¶ 32 (citing American Public Communications Council v. FCC, 215 F. 3d 51, 56 (CADC 2000)), make the FCC’s rationale obvious, namely, that in light of the history that we set forth supra, at 53-54, it is unreasonable for a carrier to violate the FCC’s *64 mandate that it pay compensation. See also In re APCC Servs., Inc. v. NetworkIP, LLC, 21 FCC Rcd. 10488, 10493-10495, ¶¶ 13-16 (2006) (spelling out the reasoning).
Fifth, Global Crossing argues that a different statutory provision, §276, see supra, at 51, prohibits the FCC’s § 201(b) classification. Brief for Petitioner 26-28. But §276 simply requires the FCC to “take all actions necessary ... to prescribe regulations that... establish a per call compensation plan to ensure” that payphone operators “are fairly compensated.” 47 U. S. C. § 276(b)(1). It nowhere forbids the FCC to rely on § 201(b). Rather, by helping to secure enforcement of the mandated regulations the FCC furthers basic § 276 purposes.
Finally, Global Crossing seeks to rest its claim of a §276 prohibition upon the fact that § 276 requires regulations that secure compensation for “every completed intrastate,” as well as every “interstate,” payphone-related call, while § 201(b) (referring to § 201(a)) extends only to “interstate or foreign” communication. Brief for Petitioner 37. But Global Crossing makes too much of too little. We can assume (for argument’s sake) that § 201(b) may consequently apply only to a portion of the Compensation Order’s requirements. But cf., e.g., Louisiana Pub. Serv. Comm’n, 476 U. S., at 375, n. 4 (suggesting approval of FCC authority where it is “not possible to separate the interstate and the intrastate components”). But even if that is so (and we repeat that we do not decide this question), the FCC’s classification will help to achieve a substantial portion of its §276 compensatory mission. And we cannot imagine why Congress would have (implicitly in this §276 language) wished to prohibit the FCC from concluding that an interstate half loaf is better than none.
For these reasons, the judgment of the Ninth Circuit is affirmed.

It is so ordered.

*65 APPENDIXES TO OPINION OF THE COURT
A
In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,14 FCC Red. 2545, 2631-2632, ¶¶ 190-191 (1999) (Compensation Order).
In re the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, 18 FCC Red. 19975, 19990, ¶ 32 (2003) (2003 Payphone Order).
B
Communications Act § 201:
“(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.
“(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided *66 further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.” 47 U. S. C. § 201.
Communications Act § 206:
“In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney’s fee, to be fixed by the court in every case of recovery, which attorney’s fee shall be taxed and collected as part of the costs in the case.” 47 U.S.C. §206.
Communications Act § 207:
“Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the *67 damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.” 47U.S.C. §207.