**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4043
_____


WARREN HAVENS; SKYBRIDGE SPECTRUM
FOUNDATION, a Delaware nonprofit corporation;
TELESAURUS VPC, LLC, a Delaware Limited Liability
Company; AMTS CONSORTIUM, LLC, a Delaware Limited
Liability Company; INTELLIGENT TRANSPORTATION &
MONITORING, LLC, a Delaware Limited Liability
Company; TELESAURUS GB, LLC, a Delaware Limited
Liability Company,

Appellants

v.

MOBEX NETWORK SERVICES, LLC, a Delaware Limited
Liability Company; MOBEX COMMUNICATIONS, INC, a
Delaware corporation; MARITIME COMMUNICATIONS
LAND MOBILE LLC, a Delaware Limited Liability
Company; PAGING SYSTEMS, INC, a California
corporation; TOUCH TEL CORPORATION, a California
company; JOHN DOE Nos. 1-20

On Appeal from the United States District Court
for the District of New Jersey
(D. N.J. No. 2-11-cv-00993)
District Judge:  Honorable Katherine S. Hayden
Argued on July 7, 2015


Before:  FUENTES, *SLOVITER and ROTH, <u>Circuit Judges</u>

(Filed: April 14, 2016)


Stephen M. Hudspeth, Esq.　　　[**Argued**]
6 Glen Hill Road
Wilton, CT 06897

Michael Grohs, Esq.
Sean R. Kelley, Esq.
Saiber
18 Columbia Turnpike
Suite 200
Florham Park, NJ 07932
　　　　　　　　　　*Counsel for Appellants*

---

* The Honorable Dolores K. Sloviter assumed inactive status on April 4, 2016 after the argument and conference in this case, but before the filing of the opinion. The opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d) and Third Circuit I.O.P. Chapter 12.

Robert W. Mauriello, Jr., Esq.  **[Argued]**
Graham Curtin, P.A.
4 Headquarters Plaza
P.O. Box 1991
Morristown, NJ 07962

*Counsel for Appellee*

---

O P I N I O N

---

**ROTH**, Circuit Judge:

Warren Havens and five entities under his control brought this suit against competitors Mobex Network Services, LLC, Mobex Communications, Inc., Maritime Communications/Land Mobile, LLC (MCLM), Paging Systems, Inc. (PSI), and Touch Tel Corporation for allegedly violating the Federal Communications Act (FCA) and the Sherman Antitrust Act. The District Court dismissed the two FCA claims for failure to state a claim. After a nine-day bench trial, the District Court entered judgment for MCLM on the basis that no conspiracy existed. We will affirm.

## I.

### A.  FACTS

3

Marine radio providers enable vessels to communicate while on waterways and on the high seas. An Automated Maritime Telecommunications System (AMTS) station is a special type of radio station in the United States that provides communication services between land and vessels in navigable waterways. The AMTS spectrum is 217 to 218 MHz and 219 to 220 MHz.[1] Advances in wireless technology have greatly expanded the potential uses of AMTS's, including systems for public transportation safety, such as "Positive Train Control."

The FCC originally issued licenses to use AMTS-designated frequencies on a site-based system. In this system, the site is a small geographic region defined by location and the waterway served. These "site-based" licenses were provided at no cost on a first-come, first-served basis. In 2000, the FCC stopped issuing site-based licenses and began issuing AMTS licenses on a geographic basis through a competitive bidding process. Under the new procedure, the FCC divided the United States into ten regions and, at two public auctions, sold "geographic" licenses for two blocks of AMTS frequencies (A block and B block) in each region. Both site-based and geographic licensees are subject to buildout and service requirements to remain valid.[2]

Although geographic licensees may generally place stations anywhere within their allotted region, they may not interfere with the functioning of existing site-based stations. Specifically, 47 C.F.R. § 80.385(b)(1) requires that an "AMTS geographic area licensee must locate its stations at least 120 kilometers from the stations of co-channel site-

---

[1] *See* 47 C.F.R. §§ 2.106, 30.385.

[2] *See* 47 C.F.R. §§ 1.946(c), 1.955(a), 80.49(a)(3).

based AMTS licensees" to avoid radio interference with site-based usage. In other words, the location of a site-based station creates a gap in a geographic licensee's coverage area in which the geographic licensee is barred from transmitting on AMTS frequencies. If a site-based license is terminated, revoked, or found invalid, however, the spectrum will revert automatically to the geographic licensee.[3]

Plaintiffs and defendants are holders of various AMTS licenses in the United States. Out of the twenty geographic licenses in the United States that were available at auction, plaintiffs obtained thirteen, MCLM obtained four, and PSI obtained two. None of the defendants sought to bid on licenses in the same block and region in which the other defendants held a pre-existing site-based license. But plaintiffs obtained geographic licenses in areas overlaying many of Mobex, MCLM, and PSI's pre-existing site-based licenses. At the center of this dispute is MCLM's refusal to disclose to plaintiffs the location of MCLM's operating site-based stations within plaintiffs' geographic regions. Unable to agree on who should turn over their geographic coordinates first, the parties did not exchange information. This action, along with various FCC administrative proceedings, followed.

## B. PROCEEDINGS

On June 20, 2008, plaintiffs brought claims against MCLM, Mobex Network Services, PSI, and Touch Tel. The parties then agreed to dismiss the case without prejudice in light of a pending action in California state court. On

---

[3] *See id*. § 80.385(c).

February 18, 2011, Havens filed a Second Amended Complaint under a new docket number and added Mobex Communications as a defendant. Plaintiffs assert three claims in the Second Amended Complaint. In Count I, they seek a mandatory injunction under § 401(b) of the FCA to force defendants to comply with 47 C.F.R. § 80.385 and with the directives set out in three FCC documents, which plaintiffs refer to as the "Cooperation Orders."[4] Specifically, plaintiffs request that the court require defendants to provide plaintiffs with the operating contours for their site-based locations that are located within plaintiffs' geographic locations. In Count II, plaintiffs allege that defendants violated § 201(b) of the FCA by taking actions that are "unjust and unreasonable" and seek monetary damages under §§ 206 and 207. Plaintiffs also allege in Count III that defendants violated § 1 of the Sherman Act by conspiring among themselves and with non-named parties, in unreasonable restraint of trade or commerce in the AMTS market, as evidenced by defendants' coordination of the purchase of A and B block licenses, their agreement to "warehouse" licenses by failing to construct site-based stations and by refusing to disclose the operating stations' contours, and their false representations to the industry and the FCC.[5]

---

[4] We use this term simply to refer to the documents described by Plaintiffs, and not to imply that they constitute "orders" within the meaning of § 401(b). *See infra* Part II.A.

[5] Count III also includes claims under § 2 of the Sherman Act based on the "Essential Facilities Doctrine." These claims were dismissed by the District Court pursuant to Rule 12(b)(6) and are not at issue in this appeal.

Plaintiffs attached the three "Cooperation Orders" to the Second Amended Complaint. The first document is an April 8, 2009, FCC declaratory ruling in response to MCLM's request for clarification regarding § 80.385(b)(1), in which the Commission declared that a geographic licensee's co-channel interference protection obligations should be based on actual operating parameters, rather than maximum permissible operating parameters. In a footnote, the FCC then stated: "As we noted in [a prior] decision, we expect incumbent AMTS licensees to cooperate with geographic licensees in order to avoid and resolve interference issues. This includes, at a minimum, providing upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour."[6]

The second Cooperation Order, dated March 20, 2009, concerns a marine radio provider's application to modify its AMTS geographic license and PSI's petition to dismiss the application on the basis that the geographic licensee had not afforded PSI's site-based location adequate protection. In dismissing PSI's petition, the FCC noted that the application had to make certain assumptions regarding PSI's site-based location. In the immediately following footnote, the FCC then stated that "AMTS site-based incumbents are expected to cooperate with geographic licensees in order to avoid and resolve interference issues. . . . This includes, at a minimum, providing upon request sufficient information to enable

---

[6] Dennis C. Brown, Esq., *Letter*, 24 FCC Rcd. 4135, 4136 n.9 (2009) (*Letter*) (internal quotations omitted).

7

geographic licensees to calculate the site-based station's protected contour."[7]

The last Cooperation Order is an April 16, 2010, FCC denial of reconsideration of its declaratory ruling at issue in the first Cooperation Order. In reaffirming its decision that actual parameters should be used for determining co-channel interference protection, the FCC observed that "AMTS site-based licensees are expected to cooperate with geographic licensees in avoiding and resolving interference issues, and . . . this obligation requires, at a minimum, that the site-based licensee 'provid[e] upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour.'"[8]

On December 22, 2011, the District Court dismissed plaintiffs' FCA claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[9] On Count I, the District Court held that 47 C.F.R. § 80.385 and the Cooperation Orders do not constitute "orders" under the meaning of § 401(b) because they do not require defendants to engage in any particular disclosure of their contour information. On Count II, the

---

[7] *In re Applications of Ne. Utils. Serv. Co. to Modify License for Station WQEJ718*, 24 FCC Rcd. 3310, 3311 n.12 (2009) (*NUSCO Order*).

[8] *In re Maritime Commc'ns/Land Mobile, LLC Warren Havens, Envtl. LLC, Intelligent Transp. & Monitoring LLC, Skybridge Spectrum Found.*, 25 FCC Rcd. 3805, 3807 ¶ 6 (2010) (*Reconsideration Order*) (quoting *Letter*, 24 FCC Rcd. at 4136 n.9).

[9] *See Havens v. Mobex Network Servs., LLC*, No. 11-993, 2011 WL 6826104 (D.N.J. Dec. 22, 2011).

District Court held that the FCC had not yet addressed whether the precise type of conduct at issue here was "unjust or unreasonable" and therefore plaintiffs had no private right of action under §§ 206 and 207.

MCLM subsequently moved for summary judgment on the remaining claim. Plaintiffs sought to reopen discovery pursuant to Rule 56(d). At this point, the other defendants had stopped actively litigating the case. Mobex had become defunct and had had default entered against it in February 2013; PSI and Touch Tel entered into a settlement agreement with plaintiffs on April 8, 2013. On March 20, 2014, the District Court denied both MCLM's motion for summary judgment and plaintiffs' Rule 56(d) motion.

The bench trial began on May 20, 2014, and proved contentious. Prior to trial, plaintiffs sought to admit 6,500 trial exhibits but then revised the list to 522 exhibits, and were eventually ordered to limit the list further. Six witnesses testified, including two plaintiffs' experts who described advances in accident avoidance in railroad transportation. Warren Havens also testified on behalf of all plaintiffs. Additional witnesses were Sandra DePriest, MCLM founder; Donald DePriest, her husband and a communications businessman; and John Reardon, former Mobex Communications president, CEO, and general counsel. The parties also submitted excerpts of deposition testimony of David Kling, a Touch Tel engineer; David Predmore, a former Mobex Communications and Mobex Network in-house attorney; and Robert Cooper, Touch Tel's president. The nine-day bench trial concluded on June 10, 2014.

Almost a month after the parties had submitted proposed findings of fact and conclusions of law, plaintiffs

9

wrote to the District Court to appraise it of "certain new and material information." Plaintiffs attached MCLM's responses to interrogatories served by the FCC, in which MCLM stated that it had abandoned many of its sites prior to May 12, 2012, and December 2, 2013. Plaintiffs claim that, had MCLM disclosed this previously, plaintiffs would have been significantly less hindered in their build-out plans for their geographic stations. According to plaintiffs, "the only credible reason for MCLM not so advising plaintiffs was to uphold, and keep hidden, MCLM's contribution to its antitrust conspiracy with PSI."

On September 2, 2014, the District Court found in favor of MCLM on the basis that plaintiffs had failed to show by a preponderance of the evidence that a conspiracy existed.[10] "Put another way, were the Court as factfinder presented with [this] question in a typical verdict sheet given to the jury in a Sherman Act § 1 case, . . . the Court would answer, easily, No."[11] Because plaintiffs lost on the merits, the court dismissed the default judgment against Mobex as well.

## **II.**[12]

---

[10] *See Havens v. Maritime Commc'ns/Land Mobile, LLC*, No. 11-993, 2014 WL 4352300 (D.N.J. Sept. 2, 2014).

[11] *Id.* at *30.

[12] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and we exercise jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Farber v. City of*

10

### A. PRIVATE ENFORCEMENT OF FCC ORDERS

Section 401(b) of the FCA gives private individuals an express right to enforce FCC "orders." This provision authorizes injunctive relief for any party injured where another party "fails or neglects to obey any order of the Commission other than for the payment of money."[13] Plaintiffs seek a court order directing MCLM to provide them with contour information for its site-based AMTS stations. However, plaintiffs are entitled to a remedy only if the provisions of 47 C.F.R. § 80.385(b)(1) or the so-called Cooperation Orders constitute "orders" within the meaning of § 401(b).

We previously addressed the definition of an "order" under § 401(b) in *Mallenbaum v. Adelphia Communications Corp.*[14] There, the plaintiffs challenged Adelphia's monthly

---

*Paterson*, 440 F.3d 131, 134 (3d Cir. 2006). "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997). "We review the District Court's factual finding from the non-jury trial under a clearly erroneous standard . . .." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). When we are confronted with mixed questions of law and fact, however, "we apply the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review." *Id.*

[13] 47 U.S.C. § 401(b).

[14] 74 F.3d 465 (3d Cir. 1996).

11

fee to cable subscribers who received programming on more than one television set. The monthly fee was based on 47 C.F.R. § 76.923, which requires that charges for multiple outlets be based on actual cost.[15] In analyzing whether the plaintiffs had an express right of action under § 401(b), we began by considering the Supreme Court's decision in *Columbia Broadcasting System, Inc. v. United States*.[16] Although *CBS* interpreted a different provision of the FCA, we identified from it the general principle that "an agency regulation should be considered an 'order' if it requires a defendant to take concrete actions."[17] We then outlined the circuit split in applying this principle,[18] but declined to

---

[15] *Id.* at 467.

[16] 316 U.S. 407 (1942).

[17] *Mallenbaum*, 74 F.3d at 468 (citing *CBS*, 316 U.S. at 416-25).

[18] Currently, the Fourth, Fifth, Sixth, Seventh, and Ninth Circuits expressly or implicitly hold that "order" encompasses both FCC adjudicatory and rulemaking orders, *see Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 200-01 (4th Cir. 2013); *Alltel Tenn., Inc. v. Tenn. Pub. Serv. Comm'n,* 913 F.2d 305, 308 (6th Cir. 1990); *Hawaiian Tel. Co. v. Pub. Utils. Comm'n*, 827 F.2d 1264, 1271 (9th Cir. 1987); *Ill. Bell Tel., Co. v. Ill. Commerce Comm'n*, 740 F.2d 566, 571 (7th Cir. 1984); *S. Cent. Bell Tel. Co. v. La. Pub. Serv. Comm'n*, 744 F.2d 1107, 1115-19 (5th Cir. 1984), *vacated and remanded on other grounds by* 476 U.S. 1166 (1986), whereas, the First Circuit requires that an "order" be judicial in nature, *see New England Tele. and Tele. Co. v. Pub. Utils. Comm'n*, 742 F.2d 1, 4-8 (1st Cir. 1984). Much of this disagreement stems from the question of whether a court

choose between the two approaches because the plaintiffs lost under either test.[19] Specifically, 47 C.F.R. § 76.923 does not order cable operators to charge specific rates; rather, it offers "guidelines to be followed by local franchising authorities" and "[did] not itself require particular actions to be taken by defendant Adelphia."[20]

As in *Mallenbaum*, we will not adopt either approach to defining "order" under § 401(b) because 47 C.F.R. § 80.385(b)(1) and the Cooperation Orders fail under both standards. For its part, § 80.385 does not address a site-based licensee's duty to provide contour information. In fact, it is focused solely on the obligation of a geographic licensee to protect the site-based licensee's rights by adhering to certain requirements, and imposes no obligations on site-based licensees.[21] While the rule may "presuppose" that a site-based licensee will provide a geographic licensee its coordinates to safeguard its own interests, such an assumption cannot form the basis of an enforceable "order" under §

---

should rely on the Administrative Procedure Act's definition of "order," which is limited to "a final disposition . . . in a matter other than rule making." *See* 5 U.S.C. § 551(6).

[19] *Mallenbaum*, 74 F.3d at 468 n.5 ("We need not choose between the First Circuit and Ninth Circuit approaches, for, even assuming *arguendo* that some rules may be considered orders under § 401(b), the FCC rule at issue here may not.").

[20] *Id.* at 469.

[21] 47 C.F.R. § 80.385(b)(1) ("[E]ach AMTS geographic area licensee may place stations anywhere within its region without obtaining prior Commission approval provided: (1) The AMTS geographic area licensee must locate its stations at least 120 kilometers from the stations of co-channel site-based AMTS licensees . . ..").

401(b). Since 47 C.F.R. § 80.385(b)(1) imposes no duties on MCLM, it does not afford plaintiffs a remedy.[22]

Similarly, the Cooperation Orders do not impose any obligations on MCLM. Most of the language highlighted by plaintiffs describes the FCC's mere expectation that site-based and geographic licensees will cooperate with one another.[23] This makes sense considering that the documents were not intended to address a site-based licensee's obligations. Like § 80.385, the Cooperation Orders describe a geographic licensee's duty to a site-based licensee: the first and third documents provide the procedure for determining the necessary level of interference protection and the second document resolves a dispute concerning interference. Only in dicta—indeed, relegated mostly to footnotes—did the FCC describe any duty owed by site-based licensees. We do not view this language as creating any binding or enforceable requirement under § 401(b).

---

[22] *See Mallenbaum*, 74 F.3d at 469; *see generally CBS*, 316 U.S. at 416-25.

[23] *See, e.g.*, *Letter*, 24 FCC Rcd. at 4136 n.9 ("[W]e expect incumbent AMTS licensees to cooperate with geographic licensees in order to avoid and resolve interference issues." (internal quotations omitted)); *NUSCO Order*, 24 FCC Rcd. at 3311 n.12 ("AMTS site-based incumbents are expected to cooperate with geographic licensees in order to avoid and resolve interference issues."); *Reconsideration Order*, 25 FCC Rcd. at 3807 ¶ 6 ("AMTS site-based licensees are expected to cooperate with geographic licensees in avoiding and resolving interference issues . . ..").

Furthermore, even if the Cooperation Orders require MCLM to take some action, that action is not sufficiently concrete. The FCC requested that site-based licensees, "at a minimum, provid[e] upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour."[24] This language says nothing about how any alleged obligation should be undertaken: When, and in what matter, must the information be provided? In fact, the FCC described cooperation as needed "in order to avoid and resolve interference issues,"[25] implying that disclosure of contour information may occur only *after* an interference issue arises.

We therefore reiterate that vague statements by the FCC, particularly when made in dictum, cannot form the basis of an "order" under § 401(b). Because neither 47 C.F.R. § 80.385(b)(1) nor the so-called Cooperation Orders constitute an "order," we will affirm the District Court's dismissal of Count I.

---

[24] *Letter*, 24 FCC Rcd. at 4136 n.9; *NUSCO Order*, 24 FCC Rcd. at 3311 n.12; *see Reconsideration Order*, 25 FCC Rcd. at 3807 ¶ 6.

[25] *Letter*, 24 FCC Rcd. at 4136 n.9; *NUSCO Order*, 24 FCC Rcd. at 3311 n.12; *see Reconsideration Order*, 25 FCC Rcd. at 3807 ¶ 6; *see also In re Amendment of the Commission's Rules Concerning Maritime Communications, Second Memorandum Opinion and Order and Fifth Report and Order*, 17 FCC Rcd. 6685, 6704 ¶ 39 (2002) ("In instances where interference occurs, we will expect the licensees to coordinate among themselves to minimize such interference and to cooperate to resolve any interference problems that may arise.").

## B. PRIVATE ACTIONS UNDER SECTION 207.

Under 47 U.S.C. § 207, any person damaged by a common carrier may either make a complaint to the FCC or sue in district court for "the recovery of the damages for which such common carrier may be liable under the provisions of this chapter." Common carriers, such as MCLM, are liable if they "do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done."[26] Plaintiffs claim that MCLM violated § 201(b), which declares that all practices in connection with common carrier service shall be "just and reasonable" and that any "unjust or unreasonable [practice] is declared to be unlawful."[27]

A plaintiff is not entitled to a cause of action under § 207 simply on the basis of its own determination that conduct was "unjust or unreasonable." In *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, the Supreme Court considered whether a payphone operator could bring a federal claim under § 207 on the basis of the FCC's determination that "a carrier's refusal to pay the compensation ordered amounts to an 'unreasonable practice' within the terms of § 201(b)."[28]

---

[26] 47 U.S.C. § 206.

[27] Plaintiffs identify many other FCC rules and orders that Defendants allegedly violated, but they confine their appeal to the question of whether the conduct underlying these violations was "unjust or unreasonable" under § 201(b).

[28] 550 U.S. 47, 52 (2007) (internal quotations omitted).

The Court held that a private lawsuit is proper under § 207 only "*if* the FCC could properly hold that a carrier's failure to pay compensation is an 'unreasonable practice' deemed 'unlawful' under § 201(b)."[29] Here, plaintiffs do not rely on any regulation determining that the particular type of actions taken by MCLM were "unjust or unreasonable" under the meaning of § 201(b). Instead, plaintiffs assert that such a finding is unnecessary based on the FCA's grant of a broad private remedy and "the Supreme Court's intentional use of the phrase '*could* properly hold' instead of '*did* properly hold'" in *Global Crossing*.[30] We do not agree.

In creating § 201(b), Congress "delegated to the agency authority to 'fill' a 'gap,' *i.e.*, to apply § 201 through regulations and orders with the force of law."[31] Although § 201(b)'s language is certainly broad, its purpose is to empower the FCC to declare unlawful certain common carrier practices.[32] Nothing in the statute implies that violations of

---

[29] *Id.* at 52-53.

[30] *See* Pls.' Br. at 55-57 (emphasis added in brief).

[31] *Global Crossing*, 550 U.S. at 57; *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980-81 (2005) ("[Section 201(b)] give[s] the Commission the authority to promulgate binding legal rules . . ..").

[32] *See* 47 U.S.C. § 201(b) ("All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful. . . . *Provided*, That communications by wire or radio subject to this chapter may be classified . . . as the Commission may decide to be just and reasonable . . .. The Commission may prescribe such rules and regulations as may be necessary in

all FCC regulations amount to unjust or unreasonable practices, and plaintiffs point to no authority supporting such an interpretation. Furthermore, adopting plaintiffs' approach would "put interpretation of a finely-tuned regulatory scheme squarely in the hands of private parties and some 700 federal district judges, instead of in the hands of the Commission."[33] It strains reason to believe that Congress intended such a result. A more common sense reading of the statute is that the FCC must first determine that a particular type of practice constitutes an "unjust or unreasonable" practice under § 201(b) before a plaintiff may bring a cause of action under § 207 on the basis of that conduct.

Although *Global Crossing* did not state that there must be an FCC ruling deeming the conduct at issue "unjust or unreasonable," an FCC determination was critical to its analysis. The Court first noted that "the FCC has long implemented § 201(b) through the issuance of rules and regulations."[34] It then considered the more "difficult question" of "whether the particular FCC regulation . . . lawfully implements § 201(b)'s 'unreasonable practice' prohibition."[35] Applying the *Chevron* framework, the Court held that the FCC properly implemented § 201(b) due to its reasonable determination that failure to abide by its rate

---

the public interest to carry out the provisions of this chapter.").

[33] *N. Cnty. Comm'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1158 (9th Cir. 2010) (internal quotations omitted).

[34] *Global Crossing*, 550 U.S. at 53.

[35] *Id.* at 54-55.

18

determinations was an unjust or unreasonable action.[36] In other words, the question of lawful implementation was premised on there being an FCC finding in the first place. Moreover, the Court carefully limited its holding by stating that not "every violation of FCC regulations is an unjust and unreasonable practice."[37] Although the Court used the phrase "if the FCC could properly hold" instead of "if the FCC did properly hold," its emphasis in the sentence—and throughout the opinion—was on "*if*" the FCC's determination was proper.[38] We therefore do not agree that, by using one turn of phrase, the Court sanctioned such an expansive reading of the FCA.

We will affirm the District Court's dismissal of Count II because plaintiffs do not identify any particular actions taken by MCLM that have been determined by the FCC to be unreasonable or unjust. Therefore, plaintiffs do not possess a private right of action under § 207.[39]

---

[36] *Id.* at 55-57; *see id.* at 60 ("[T]he FCC properly implements § 201(b) when it reasonably finds that the failure to follow a Commission, *e.g.*, rate or rate-division determination made under a *different* statutory provision is unjust or unreasonable under § 201(b).").

[37] *Id.* at 56.

[38] *See id.* at 53 ("Insofar as the statute's language is concerned, to violate a regulation that lawfully implements § 201(b)'s requirements *is* to violate the statute.").

[39] The FCC need not have declared a particular defendant's actions unreasonable in a prior adjudication. In *Demmick v. Cellco Partnership*, Verizon argued that claims under § 201(b), prior to being filed in federal court, "must be brought to the Federal Communications Commission . . . for a

## C. CONCERTED ACTION.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."[40] "The existence of an agreement is the hallmark of a Section 1 claim."[41] For liability under § 1 to exist, there must be a "unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement."[42] This can be shown by putting forth direct evidence of concerted action, such as "a document or conversation explicitly manifesting the existence of the agreement in question,"[43] or circumstantial evidence of

---

determination regarding the reasonableness of the challenged conduct." No. 06-2163, 2011 WL 1253733, at *2 (D.N.J. Mar. 29, 2011). The court rejected this argument based, in part, on the fact that there was no prior adjudication in *Global Crossing*. *Id.* at *4-5. But, in *Global Crossing*, the FCC announced through general rulemaking that a particular type of practice was unjust or unreasonable. This, too, is all our holding today requires in order to maintain a cause of action.

[40] 15 U.S.C. § 1.

[41] *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999).

[42] *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994) (internal quotations omitted).

[43] *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010).

conscious parallel conduct and other "plus factors."[44]  The term "plus factors" refers to circumstances demonstrating that the wrongful conduct "was conscious and not the result of independent business decisions of the competitors."[45]

Plaintiffs' direct evidence of concerted action at trial was an alleged agreement that was reached during a conversation over twenty-five years ago between Touch Tel's president Cooper and a businessman named Fred Daniel. Daniel is the founder of Regionet, a marine radio provider that was later acquired by Mobex.  According to plaintiffs, Cooper and Daniel agreed to split up the market for geographic licenses, whereby Regionet would only bid on A block licenses and PSI and Touch Tel would only bid on B block licenses.  Plaintiffs further alleged that knowledge of this conspiracy passed to Mobex employees after Regionet was acquired in 2000, and then to MCLM after it purchased Mobex's licenses in 2005.  Plaintiffs also sought to prove the existence of concerted action by virtue of certain plus factors, including that defendants refused to provide contour information, did not construct or operate their stations, and took actions not in their individual economic interests.

On appeal, plaintiffs mainly quibble with the District Court's conclusion that no agreement existed.  Notably absent from this discussion is any recitation or application of the clearly erroneous standard of review, which must guide our analysis.  A finding of fact is clearly erroneous only if it is "completely devoid of minimum evidentiary support

---

[44] *See In re Flat Glass Antitrust Litig*., 385 F.3d 350, 360 & n.11 (3d Cir. 2004).
[45] *Baby Food*, 166 F.3d at 122.

21

displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data."[46]   In an extensive 59-page opinion, the District Court examined all of the evidence and provided more than ample support for its conclusion that no concerted action existed.   The District Court first found that Daniel and Cooper's early conversation illustrated only "a course of action that Daniel and his company intended to take, which arguably warned Cooper off of pursuing the same course" and did not amount to direct evidence of market-allocation.[47]   As to any evidence that such an agreement continued, the District Court found the evidence speculative, only showing an opportunity for, not the existence of, an unlawful agreement.[48]   Lastly, the District Court determined that the alleged plus factors did not amount to evidence that a meeting of the minds existed.[49]   We find no clear error in the District Court's factual findings.

Plaintiffs argue that the District Court applied an improper standard of proof in its treatment of the plus factors. Specifically, plaintiffs cite cases in which we found that the sharing of confidential information between horizontal competitors could indicate that a conspiracy existed.[50]   But, in those cases, we were asked to review a district court's grant of summary judgment, when the facts must be viewed in the

---

[46] *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004) (internal quotations omitted).

[47] *Havens*, 2014 WL 4352300, at *17.

[48] *See id.* at *20-22.

[49] *See id*. at *22-30.

[50] *See, e.g.*, *Flat Glass*, 385 F.3d 350; *Baby Food*, 166 F.3d 122; *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co*., 998 F.2d 1224 (3d Cir. 1993).

22

light most favorable to the non-moving party and all reasonable inferences must be drawn in that party's favor. In other words, we held that the sharing of confidential information *may* be evidence of a conspiracy, not that it *must* be. Here, the District Court properly denied summary judgment and allowed the claims to proceed to trial. At trial, the court was then tasked with evaluating the credibility of the witnesses and weighing the evidence that plaintiffs actually put forth. The court's findings were made on this basis.

Plaintiffs claim that the District Court erred further by crediting the testimony of MCLM's key witnesses despite plaintiffs' after-trial submission, which allegedly demonstrates that those witnesses lied at trial. As a preliminary matter, plaintiffs do not clarify how the District Court should have treated this evidence. They included no formal request for relief in their August 22, 2014, letter, seeking only consideration of MCLM's interrogatory responses as additional evidence of conspiracy. It appears that the District Court did just that but was not persuaded. And rightfully so: Rather than offering "new and material" information, this submission repeated the same unsubstantiated and largely irrelevant arguments plaintiffs made at the bench trial. We therefore find no clear error in the District Court's decision to credit the testimony of MCLM's witnesses.

## III. CONCLUSION.

For the foregoing reasons, we will affirm the District Court's dismissal of Counts I and II pursuant to Rule 12(b)(6) and its entry of judgment in favor of MCLM on Count III.

23