# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30634

United States Court of Appeals
Fifth Circuit

**FILED**

June 27, 2017

Lyle W. Cayce
Clerk

CENTURYTEL OF CHATHAM, LLC, ET AL.

Plaintiffs - Appellees

v.

SPRINT COMMUNICATIONS COMPANY, L.P.

Defendant - Appellant

Appeals from the United States District Court
for the Western District of Louisiana

Before BARKSDALE, GRAVES, and HIGGINSON, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Regarding the amount Sprint Communications Company, L.P., was required to pay for the right to access the telephone-service subscribers of various local administrators (collectively, CenturyLink), primarily at issue is the proper application of the 1996 Telecommunications Act as applied by the Federal Communications Commission (FCC). Sprint partnered with cable companies to, *inter alia*, convert calls from Internet-based calling technology for delivery to CenturyLink customers with otherwise-incompatible traditional-format telephone services. Pursuant to federal and state regulatory regimes, CenturyLink billed Sprint at CenturyLink's exchange-

No. 16-30634

access tariff rates for Sprint's being able to connect to CenturyLink's subscribers; and Sprint paid these rates without dispute until 2009, when it began claiming its transfer service was exempt from the tariff rates.

Following a bench trial, the district court concluded, *inter alia*, that Sprint's transfer service was subject to the tariff rates. *CenturyTel of Chatham, LLC, et al. v. Sprint Commc'ns Co., L.P.*, 185 F. Supp. 3d 932, 946 (W.D. La. 2016). Also at issue is the court's imposing, *inter alia*, attorney's fees against Sprint for violating the 1996 Act by using "unjust and unreasonable" practices. *Id.* AFFIRMED.

I.

It goes without saying that, for a bench trial, "findings of fact are reviewed for clear error". *In re Mid-South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005). In any event, neither party challenges the court's factual findings. Accordingly, they are relied upon and cited.

Plaintiffs (again, CenturyLink) are various entities operating in numerous States as "local exchange carriers" (local administrators). *CenturyTel*, 185 F. Supp. 3d at 933–34. This action against Sprint claimed damages resulting from, *inter alia*, Sprint's refusal to pay over $8.7 million in "access charges". *Id.* at 934. Sprint counterclaimed, seeking a declaration it was not required to pay CenturyLink the higher statutory "tariff" rates under federal and state laws. *Id.*

Beginning in 2004, Sprint partnered with cable companies offering "voice-over-internet-protocol services" (VoIP) to provide, *inter alia*, the conversion of VoIP telephone calls to a "time division multiplexing" protocol (traditional format) to facilitate calls between the two types of networks. *Id.* at 935–36. Conversion for these two types of calling is necessary because they are otherwise incompatible; VoIP is a newer technology that delivers telephone

2

No. 16-30634

calls by splitting data into tiny packets traveling the most efficient pathways available, rather than the traditional format, which transmits data over a single pathway. *Id.* at 935 n.4.

Therefore, for a VoIP subscriber to call someone still using traditional-format technology, a conversion is required. *Id.* at 935. Once converted, Sprint transmitted the calls to, *inter alia*, local administrators, like CenturyLink, which administer the distribution of telephone calls for termination to their subscribers. *Id.* at 936.

But, Sprint also transferred calls originating in traditional format to CenturyLink's traditional-format customers. *Id.* During the period relevant to this dispute, CenturyLink did not distinguish between the originating format of calls it received from Sprint, and, concomitantly, charged Sprint the same rates for calls from both VoIP callers and traditional-format callers; by the time CenturyLink received the calls from Sprint, they had already been converted. *Id.* "The VoIP-originated calls were thus in the same format as and intermingled with [traditional-format-originated] calls." *Id.*

Historically, for a company like Sprint to connect long-distance telephone-service subscribers to local administrators' customers, like CenturyLink's, it must pay an exchange-access tariff, as approved either by the FCC for interstate calls, or by state regulators for intrastate calls. *Id.* CenturyLink "properly filed with [the FCC] one or more tariffs for the provision of interstate switched access service", and accordingly, "its federal tariffs were legally binding". *Id.* The same was true for its state tariffs, relevant to the intrastate calls. *Id.* As discussed *infra*, the rates varied, based on the type of service being provided.

Prior to July 2009, Sprint paid, without dispute, the tariffs billed by CenturyLink, which, as discussed, included traditional-format and VoIP-

No. 16-30634

originated calls. *Id.* Beginning in July 2009, however, Sprint began disputing the tariff-rate access charges assessed in invoices from CenturyLink, specifically the rates applied to VoIP-originated calls. *Id.* For those invoices, instead of paying the billed tariff rates, Sprint instead paid $0.0007 per minute—the rate the FCC applied to local Internet-service-provider-bound traffic—for its VoIP-originated calls converted for transfer to CenturyLink's traditional-format customers; but, CenturyLink "did not agree or acquiesce". *Id.* at 937 & n.7. On the other hand, Sprint continued to pay the undisputed amount billed for its calls originating in traditional format. *Id.* With its resulting partial payments, it submitted an explanation: "To date, although the FCC has asserted jurisdiction over VoIP services and has determined that information services [as discussed *infra*] are not subject to access [tariffs], the FCC has not yet rendered a determination as to the applicable inter-carrier compensation for VoIP traffic". *Id.* at 937. Sprint stated it would continue this partial-payment practice until guidance was offered by the FCC. *Id.*

In addition to withholding the amount it deemed unjustified for ongoing VoIP-originated calls transferred to CenturyLink, Sprint retroactively estimated a percentage of VoIP-originated calls transferred to CenturyLink for the period August 2007 to July 2009, and calculated an amount of "overpayment" for that period. *Id.* Sprint deducted this "overpayment" from its July 2009 approved payments going forward. *Id.*

The disputed period ended October 2011, when the FCC's Comprehensive Reform Order was issued. *Id.* at 935, 938 (citing *In the Matter of Connect Am. Fund*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663 (2011) (Comp. Reform Order)). That order, *inter alia*, expressly clarified that, going forward, VoIP-originated calls would be subject to the interstate exchange-access tariff rates, Comp. Reform Order,

4

No. 16-30634

26 FCC Rcd. at 18002, ¶ 933; but, the tariff regime would be phased out completely by 2020. *Id.* at 17934, ¶ 801.

This action originated in 2009, before being transferred to multidistrict litigation in the northern district of Texas, with the claims at issue here being severed and remanded to the western district of Louisiana. *See In re IntraMTA Switched Access Charges Litig.*, No. 3:14-MD-2587, 2015 WL 7252948 (N.D. Tex. 17 Nov. 2015). After a two-day bench trial, followed by post-trial briefing, the court ruled in favor of CenturyLink. *CenturyTel*, 185 F. Supp. 3d at 934, 946.

Regarding the federal tariffs, at issue was the proper application of § 251(g) of the 1996 Telecommunications Act, 47 U.S.C. § 251(g). *CenturyTel*, 185 F. Supp. 3d at 940–41. That provision is a grandfather clause, preserving the pre-Act "restrictions and obligations (including receipt of compensation) that apply . . . under any court order, consent decree, or regulation, order or policy of the [FCC], until such restrictions and obligations are explicitly superseded by regulations prescribed by the [FCC]". 47 U.S.C. § 251(g).

Prior to the passage of the 1996 Act, local administrators, like CenturyLink, were allowed monopolies over local services. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). An "interexchange carrier" (IXC), like Sprint, provided the long-distance service, connecting callers in one locality to those in others. *CenturyTel*, 185 F. Supp. 3d at 940. (As discussed *infra*, Sprint's being an "IXC" is critical to resolving this appeal.) Under the pre-Act framework, the local monopolies could impose an exchange-access tariff on the long-distance provider in exchange for access to that local network. *Id.* (citing *In re IntraMTA*, 2015 WL 7252948, at \*2, \*4–5).

Although these local monopolies were abolished under the 1996 Act, the already-established local administrators continued to be permitted to charge

tariffs to telecommunications carriers for access unless and until the FCC explicitly superseded that system. *Id.* at 940–41. In that regard, however, the FCC in 1980 had recognized an exemption from the higher-tariff rates for "enhanced service" providers. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Svcs.*, 545 U.S. 967, 976–77 (2005) (citing *In re Amendment of Section 64.702 of the Comm'n's Rules and Regulations (Second Computer Inquiry)*, 77 FCC 2d 384, 420–22 (1980)). Enhanced services were distinct from "basic services".

Basic services "meant a communications path that enabled the consumer to transmit an ordinary-language message to another point, with no computer processing or storage of the information, other than the processing or storage needed to convert the message into electronic form and then back into ordinary language for purposes of transmitting it over the network—such as via a telephone or facsimile". *Id.* at 976. Enhanced services, on the other hand, were services "in which 'computer processing applications [were] used to act on the content, code, protocol, and other aspects of the subscriber's information,' such as voice and data storage services, as well as 'protocol conversion' (*i.e.*, ability to communicate between networks that employ different data-transmission formats)". *Id.* at 976–77 (quoting *Second Computer Inquiry*, 77 FCC 2d at 420–22, ¶¶ 97, 99) (internal citations omitted). Basic services were subject to common-carrier regulation; but, enhanced services were exempt, in order to avoid negatively restraining "the fast-moving, competitive market". *Id.* at 977 (quoting *Second Computer Inquiry*, 77 FCC 2d at 434, ¶ 129).

In *Brand X*, the Supreme Court determined these terms were carried over, under new nomenclature, by the 1996 Telecommunications Act, with basic services restyled as "telecommunications services", and enhanced services as "information services", as referenced *supra*, in the explanation

No. 16-30634

Sprint provided CenturyLink for why Sprint was paying less than it was billed. *Id.* at 977. Both services are "telecommunications", which is "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received". 47 U.S.C. § 153(50).

Telecommunications service is "the offering of telecommunications for a fee directly to the public . . . regardless of the facilities used", *id.* § 153(53), while information service is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications", *id.* § 153(24). Of these two services, only telecommunications services are subject to common-carrier regulation and the exchange-access tariffs, while information services enjoy the enhanced-services exemption. *Brand X*, 545 U.S. at 977.

Despite Sprint's emphasis on these differences, the district court concluded it need not determine whether Sprint's VoIP-to-traditional-format transfer services qualified as information services or telecommunications services. *CenturyTel*, 185 F. Supp. 3d at 941. Instead, citing the FCC's 2011 Comprehensive Reform Order, the court stated that the FCC "reject[ed] the claim that intercarrier compensation for VoIP[-to-traditional-format] traffic is categorically excluded from" the Act's grandfather clause, 47 U.S.C. § 251(g), which maintained aspects of the exchange-access tariff regime. *CenturyTel*, 185 F. Supp. 3d at 942 (quoting Comp. Reform Order, 26 FCC Rcd. at 18016–17, ¶ 957). Accordingly, such calls were still subject to pre-1996 exchange-access charges, even if classified as "information services". *Id.*

The district court also found persuasive that "the FCC was 'mindful of the need for a measured transition for carriers that receive substantial revenues from intercarrier compensation'". *Id.* at 942 (quoting Comp. Reform

No. 16-30634

Order, 26 FCC Rcd. at 18003, ¶ 935). The court noted the FCC did not expressly state the tariff regime was superseded, but instead was being phased out to ultimately be completely replaced by 2020. *Id.* (quoting Comp. Reform Order, 26 FCC Rcd. at 17934, ¶ 801).

Accordingly, the court upheld the imposition of the federal tariff rates against Sprint. *Id.* The court also ruled in favor of CenturyLink with regard to state tariffs, holding, *inter alia*, they were not preempted. *Id.* at 945.

Therefore, the court awarded damages against Sprint for the total access charges and applicable late-payment fees. *Id.* at 946. At issue were $1.1 million in interstate tariff charges, and $7.6 million for intrastate. CenturyLink claimed an additional approximate $3.2 million in late fees accrued through February 2016, with approximately $650,000 for interstate, and $2.5 million for intrastate.

Finally, the court ruled in favor of CenturyLink on its claim that Sprint violated the 1996 Act's bar against "unjust and unreasonable" practices. *Id.* Under 47 U.S.C. § 201(b), a private right of action exists for damages for "any 'practice' in connection with providing communications services 'that is unjust or unreasonable'". *CenturyTel*, 185 F. Supp. 3d at 945 (quoting § 201(b)); *see also Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 53 (2007).

Section 207 provides that "[a]ny person claiming to be damaged by any common carrier . . . may bring suit for the recovery of damages for which such common carrier may be liable under the provisions of this chapter". 47 U.S.C. § 207. A carrier is liable for "damages sustained in consequence of" the carrier's doing "any act, matter, or thing in this chapter prohibited or declared to be unlawful", as well as "a reasonable counsel or attorney's fee". *Id.* § 206.

8

No. 16-30634

Accordingly, because § 201(b) declares "unjust or unreasonable" practices to be unlawful, a remedy for damages is available. *Global Crossing*, 550 U.S. at 52–53. The court construed Sprint's retroactively withholding payment as improper "self-help", and, therefore, an "unjust or unreasonable" practice in violation of § 201(b), entitling CenturyLink to, *inter alia*, attorney's fees. *CenturyTel*, 185 F. Supp. 3d at 945–46.

II.

Sprint challenges the district court's concluding Sprint:  was required to pay CenturyLink the challenged tariff-rate access charges; and engaged in "unjust or unreasonable" practices when it retroactively "clawed-back" funds by not paying charges it undisputedly owed.  Sprint contends:  the court erred in holding the tariff rates applied to its VoIP-to-traditional-format transfer; and its claw-back practices were reasonable under industry standards.

The parties do not dispute the well-known standard of review.  The district court's conclusions of law and application of the law to the facts are reviewed *de novo*, *e.g.*, *Dresser v. Meba Med. & Benefits Plan*, 628 F.3d 705, 708 (5th Cir. 2010); its findings of fact, for clear error, *e.g.*, *In re Mid-South Towing Co.*, 418 F.3d at 531.  As stated *supra*, the findings of fact are not challenged.

A.

Sprint disputes two categories of tariff-rate charges:  state and federal. Many States imposed their own tariff rates for exchange-access transfer services, similar to those imposed by the FCC.  We address the two categories separately.

1.

As noted, the vast majority of the challenged amounts are state-imposed access charges ($7.6 million), rather than federal charges ($1.1 million).  And,

more than one-third of the total disputed amounts are charges based on intrastate traffic in Missouri. *CenturyTel*, 185 F. Supp. 3d at 943. Missouri explicitly dictates that VoIP-originated calls are subject to its intrastate access tariffs. Mo. Rev. Stat. § 392.550(2).

In district court, Sprint challenged all of the state-imposed amounts as being preempted by the federal tariff scheme. The court concluded, however: "the state access tariff rates are not preempted", based on deference to the FCC's 2011 Comprehensive Reform Order's explicitly rejecting federal preemption as applied to VoIP-to-traditional-format transfers. *CenturyTel*, 185 F. Supp. 3d at 944–45 (citing Comp. Reform Order at 18002–03, ¶ 934; 18017–18, ¶ 959).

In its opening brief here, Sprint did not challenge the court's preemption ruling, nor did it challenge any particular State's tariff regime as being misapplied here, as noted by CenturyLink in its response brief. In that regard, CenturyLink stated Sprint "abandoned its preemption argument on appeal", and "has come forth with no basis for avoiding its payment obligations under *any* of CenturyLink's State Access Tariffs". (Emphasis in original.) In its reply brief, Sprint contends it "straightforwardly" presented its preemption contentions in its opening brief, and that CenturyLink simply appears "not to understand". To support this assertion, however, Sprint cites only the jurisdictional statement in its opening brief, which invoked "the Constitution and laws of the United States, including the Supremacy Clause . . . and the Communications Act of 1934".

Pressed for clarification during its opening oral argument here, Sprint conceded it did not raise the issue, stating "it's not an argument we've made here" in response to being asked if it waived preemption; CenturyLink urged preemption was therefore waived; and, on rebuttal, Sprint reversed course

from its earlier concession and claimed it was not raising on appeal a field-occupation preemption theory, but rather its preemption contention is based on conflict preemption.  In that regard, however, Sprint conceded the reference to the Supremacy Clause in its opening brief's statement of jurisdiction is the only manner in which it could be deemed to have raised conflict preemption on appeal.

Sprint never raised preemption in its opening brief, and its reply-brief efforts are not availing.  At best, the issue was insufficiently briefed; at worst, abandoned.  Under either rubric, Sprint failed to raise preemption on appeal; as a result, the state-law tariffs cannot be challenged here.  *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its *initial* brief on appeal. . . . A party who inadequately briefs an issue is considered to have abandoned the claim.") (emphasis in original).

Even assuming *arguendo* Sprint's reply-brief contentions could be construed as adequate, "this court will not consider issues raised for the first time in a reply brief".  *Wright v. Excel Paralubes*, 807 F.3d 730, 736 (5th Cir. 2015).  Our court has recognized an exception to this rule "whereby we will consider a point of error not raised on appeal when it is necessary to prevent a miscarriage of justice".  *United States v. Whitfield*, 590 F.3d 325, 346–47 (5th Cir. 2009) (internal quotation marks omitted).  Although the general rule is "view[ed] . . . differently when a new issue is raised in the appellee's brief and the appellant responds in his reply brief", *United States v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009), that exception does not apply here; in its response brief, CenturyLink merely points out Sprint's failure to brief the issue.

No. 16-30634

2.

For the federal tariffs, the key disputes rest in the application, *vel non*, of terms defined under the 1996 Telecommunications Act.  According to Sprint, the key to resolving this action in its favor is whether its VoIP-to-traditional-format transfer service qualified as an information service or a telecommunications service under 47 U.S.C. § 153.  CenturyLink counters that this distinction is irrelevant; it asserts the proper distinction is between interexchange carriers (again, IXCs) and information-service providers, and that the FCC's rulemaking applicable to IXCs requires affirmance.

a.

The FCC's Comprehensive Reform Order makes clear the 1996 Telecommunications Act's grandfather clause maintained the exchange-access tariff regime, including its tariff rates and exemptions.  26 FCC Rcd. at 18016, ¶ 957 ("[T]o the extent that interexchange VoIP services are transmitted to the [local administrator] directly from an information service provider, such traffic is subject to pre-1996 Act obligations regarding 'exchange access,' although the access charges imposed on information service providers were different from those by IXCs.").  Sprint asserts this statement favors its contention:  the FCC declined to clarify "whether particular VoIP services are telecommunications services or information services", but stated, "because they were subject to these exchange access charges, interexchange information service traffic was subject to the over-arching [FCC] rules governing exchange access prior to the 1996 Act, and therefore subject to the grandfathering provision of [47 U.S.C. §] 251(g)".  *Id.* at 18016–17, ¶ 957.  This grandfathering would include the earlier-discussed enhanced-service exemption, as applied to information services.  *Id.* at 18016, ¶ 957.

No. 16-30634

According to Sprint, the next step is determining its VoIP-to-traditional-format transfer service qualified as an information, not a telecommunications, service. It points to the language of the 1996 Act's defining information service as "the offering of a capability for . . . transforming . . . information via telecommunications". 47 U.S.C. § 153(24). In support, Sprint relies on two unpublished district court opinions from outside our circuit, as well as an FCC ruling the parties refer to as "*IP-in-the-Middle*". *See PAETEC Comms., Inc. v. CommPartners, LLC*, No. 08-0397, 2010 WL 1767193 (D.D.C. 2010); *Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n*, 461 F. Supp. 2d 1055 (E.D. Mo. 2006); *In re Petition for Declaratory Ruling That AT&T's Phone-to-Phone IP Tel. Svcs. Are Exempt From Access Charges*, 19 FCC Rcd. 7457 (2004) (*IP-in-the-Middle*).

Sprint contends these authorities stand for the proposition that, when there is a "net protocol conversion" from Internet-protocol format (like VoIP) into another format (like traditional format), the service is an "information service". Sprint urges its proposed rule applies here, and states that, because the calls at issue originated in VoIP and terminated in traditional format, there was a net protocol conversion, making Sprint's transfer service an information service exempted from the tariff rate.

CenturyLink responds that the distinctions posited by Sprint are irrelevant. Instead, CenturyLink maintains, the key distinction is between the way the FCC, in its 2011 Comprehensive Reform Order, treats IXCs and information-service providers. Paragraph 957 of that order makes this distinction in explaining that the rates for IXCs and information-service providers were "different". Comp. Reform Order, 26 FCC Rcd. at 18016, ¶ 957.

Crucial to this issue, the district court made the following finding of fact: "Sprint acts as a telecommunications carrier providing telecommunications services as a common carrier and as an interexchange carrier ('IXC')".

No. 16-30634

*CenturyTel*, 185 F. Supp. 3d at 934–35.  The court then stated:  "It is Sprint's role as an IXC that is at issue in this case".  *Id*.  Accordingly, the court expressly found Sprint to be an IXC for the purposes of this action; that finding, of course, can only be overturned on a showing of clear error.  *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 228 (5th Cir. 1997).  But, as noted *supra*, Sprint does not even challenge the district court's findings of fact.

b.

Presented with this factual finding, the FCC's Comprehensive Reform Order controls the outcome if it is entitled to deference under *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  When considering an agency's interpretation of a statute it is charged with administering, two questions arise:  whether Congress has "directly spoken to the precise question at issue"; but if, instead, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute".  *Id*. at 842–43.  "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Brand X*, 545 U.S. at 982.

Along that line, although the two district-court decisions cited by Sprint addressed the question now before us, both did so while conceding the FCC's specific guidance would settle the matter.  *See PAETEC*, 2010 WL 1767193, at *3 n.3; *Sw. Bell*, 461 F. Supp. 2d at 1081.  Because, for the following reasons, the FCC's ruling in its 2011 Comprehensive Reform Order is reasonable, we defer to the FCC's interpretation of the 1996 Act as applied to the issues at hand.  *See Chevron*, 467 U.S. at 844.

No. 16-30634

The FCC expressly delineates between IXCs and information-service providers.  In its Comprehensive Reform Order, the FCC frames the issue as "whether there was a 'pre-Act obligation relating to intercarrier compensation for' particular traffic exchanged between a [local administrator] and '[IXC] and information service providers'". 26 FCC Rcd. at 18015, ¶ 956.  The order states: "Regardless of whether particular VoIP services are telecommunications services or information services, there are pre-1996 Act obligations regarding [local administrators'] compensation for the provision of exchange access to an IXC or an information service provider".  *Id.* at 18015–16, ¶ 957.  And, the order notes "the [FCC] has already found that toll telecommunications services transmitted (although not originated or terminated) in [Internet protocol] were subject to the access charge regime, and the same would be true to the extent that telecommunications services originated or terminated in [Internet protocol]".  *Id.* at 18016, ¶ 957.

This statement is crucial because it makes clear that telephone calls originating in VoIP format can qualify as telecommunications services even if they terminate in a different format.  Therefore, the net-protocol-conversion rule proposed by Sprint fails, and the telecommunications-services-versus-information-services distinction does not resolve the dispute.

Rather, the decisive distinction is the FCC's analysis regarding IXCs and information-service providers:

> [T]o the extent that interexchange VoIP services are transmitted to the [local administrator] directly from an information service provider, such traffic is subject to pre-1996 Act obligations regarding "exchange access," although the access charges imposed on information service providers were different from those paid by IXCs. Specifically, under the [enhanced-services] exemption, rather than paying intercarrier

15

> access charges, information service providers were permitted to purchase access to the exchange as end users, either by purchasing special access services or "pay[ing] local business rates and interstate subscriber line charges for their switched access connections to local exchange company central offices."

*Id.* In other words, IXCs were required to pay the higher tariff rates under the pre-1996 regime that was maintained through 47 U.S.C. § 251(g), and information-service providers were not.

During the disputed time period, this grandfathered system governed Sprint's VoIP-to-traditional-format transfer service. And, because the district court did not clearly err—as discussed *supra*—in finding Sprint was operating as an IXC in providing this service, rather than as an information-service provider, Sprint was obligated to pay the federal tariff rates billed by CenturyLink. (Concerning the partial dissent, we do not hold Sprint Communications Company, L.P., is only an IXC; of course, it provides a wide variety of services. Here, however, we are bound by the district court's undisputed finding that Sprint functioned as an IXC in administering the transfer service at issue.)

## B.

As noted, the court imposed, *inter alia*, attorney's fees against Sprint for violating § 201(b) of the 1996 Telecommunications Act. That provision dictates: "All charges, practices, classifications, and regulations for and in connection with [a] communication service, shall be just and reasonable, and any such . . . practice . . . that is unjust or unreasonable is declared to be unlawful". 47 U.S.C. § 201(b). A private right of action is available for "person[s] claiming to be damaged by any common carrier subject to" the 1996 Act, and damages may be recovered. *Id.* § 207. An entity found liable for

No. 16-30634

violating the Act "shall be liable to the person . . . injured thereby for the full amount of damages sustained in consequence of any such violation . . . together with a reasonable counsel or attorney's fee". *Id*. § 206.

The district court ruled "[t]he FCC has recognized that self-help is an unlawful telecommunications practice". *CenturyTel*, 185 F. Supp. 3d at 945 (citing *In re Bus. WATS, Inc.*, 7 FCC Rcd. 7942 (1992); *In re MCI Telecomm. Corp.*, 62 F.C.C. 2d 703, 706 (1976)). Accordingly, the court concluded Sprint violated § 201(b) when it "unjustly and unreasonably withheld payments . . . to reduce its retroactive refund claim". *Id*. at 946.

In challenging this conclusion, Sprint asserts "the FCC expressly interpreted section 201(b) to hold that a failure to pay a tariffed charge does not violate the provision", citing *All American Telephone Co., et al. v. AT&T Corp.*, 26 FCC Rcd. 723, 727 (2011). Moreover, it contends, the FCC has never held "self-help" constitutes a § 201(b) violation, also citing *All American Telephone*, 26 FCC Rcd. at 729.

CenturyLink agrees Sprint's withholding the disputed amounts prospectively did not violate the 1996 Act. On the other hand, CenturyLink takes issue with Sprint's clawing-back retroactively-disputed amounts it had already paid by deducting them from undisputed charges billed by CenturyLink.

a.

The deductions, which began in July 2009, were based on estimates calculated by a Sprint engineer. *CenturyTel*, 185 F. Supp. 3d at 937. Before August 2009, however, Sprint never provided the exact or estimated minutes of VoIP-originated calls it transferred to CenturyLink for termination. *Id*. at 936. Moreover, Sprint's estimate was based solely on its engineer's review of VoIP-originated versus traditional-format-originated calls delivered to

17

CenturyLink during the month of February 2009, with that amount applied each month during the August 2007 to July 2009 disputed period. *Id.* at 937.

Quoting *In re Business WATS*, CenturyLink asserts a customer in Sprint's position "is not entitled to the self-help measure of withholding payment for tariffed services duly performed but should first pay, under protest, the amount allegedly due and seek redress". The proper procedure, according to CenturyLink, was to initiate a grievance proceeding with the FCC pursuant to 47 U.S.C. § 208.

The FCC has not squarely addressed the propriety of the claw-back scheme Sprint utilized, and at issue are the terms "unjust or unreasonable". *See id.* § 201(b). For the reasons that follow, Sprint violated the Act's prohibition against "practices" that are "unjust or unreasonable".

While it is true the FCC stated "[t]he law is settled that a carrier-customer's failure to pay tariffed access charges does not violate" the statute, the practices at issue in that matter are not contested here. *All Am. Tel.*, 26 FCC Rcd. at 732, ¶ 21. There, a local administrator claimed AT&T "engaged in 'unlawful self-help' . . . by failing to bring a 'rate complaint' against the [local administrators] if AT&T believed their access charges were unlawful and instead refusing to pay the charges". *Id.* at 726, ¶ 7. There was no allegation that AT&T retroactively deducted, from undisputed invoices, amounts already paid. In fact, AT&T alleged payments it made for a few invoices were "paid by mistake" and "requested a refund". *Id.* at 725, ¶ 4.

Moreover, as the district court correctly determined, FCC precedent makes clear "self-help" is not necessarily permissible. *See In re MCI Telecomm.*, 62 F.C.C. 2d at 705–06 ("We cannot condone MCI's refusal to pay the tariffed rate for voluntarily ordered services."). The District of Columbia circuit, exercising its jurisdiction over FCC appeals, instructed: "Any carrier

that engages in self-help . . . runs the risk that the [FCC] will find against it – even if its underlying position is vindicated – and hold it liable solely for engaging in self-help". *AT&T Corp. v. FCC*, 317 F.3d 227, 234 (D.C. Cir. 2003). In that action, the D.C. circuit affirmed the FCC's ruling no violation occurred when AT&T blocked calls from its customers to those under the administration of a "sham" local administrator charging rates it was not entitled to impose, and refused to pay for ten million minutes of calls already terminated. *Id.* at 231. The D.C. circuit made clear, however, the facts at issue there fit "the seemingly narrow exception [to the prohibition against self-help] for [refusing payment to] a sham entity charging an unreasonable rate". *Id.* at 234. Here, there is no allegation of bad faith in CenturyLink's billing Sprint at tariff rates.

b.

The FCC's determination that improper "self-help" can be a violation of the 1996 Telecommunications Act is a reasonable application of § 201(b)'s prohibition against "unjust or unreasonable" practices, and we accord it deference. *See Chevron*, 467 U.S. at 844. Because the FCC has not squarely addressed Sprint's claw-back practice, however, the question is the proper application of the statute's language and the guidance provided by the FCC to the facts at hand.

Here, Sprint took the extraordinary measure of acting on its own to recoup money it had already paid without any judicial or administrative intervention. The parties' stipulated facts establish that, for more than two years, Sprint withheld payments to CenturyLink for undisputed traditional-format-to-traditional-format calls until Sprint had recovered $4.8 million. Moreover, Sprint's utilization of one month's worth of calls as applicable to all months during a two-year period, without adjustment for seasonal calling trends or other extrapolation, was not reasonable. Accordingly, Sprint's

No. 16-30634

retroactive claw-back against undisputed charges based on unreasonable estimates constitutes unlawful self help, in violation of 47 U.S.C. § 201(b).

III.

For the foregoing reasons, the judgment is AFFIRMED.

No. 16-30634

STEPHEN A. HIGGINSON, Circuit Judge, concurring in part and dissenting in part:

The majority opinion concludes that because Sprint is an interexchange carrier ("IXC") (1) it cannot be an information service provider, (2) it cannot benefit from the ESP exemption, and accordingly, (3) it must pay the tariff rates on its VoIP services.   Each conclusion contravenes longstanding precedent holding that IXCs can provide information services, and when they do, they can benefit from the ESP exemption.  I thus respectfully dissent from Part II.A.2 and II.B of the majority opinion.

First, an IXC can also be an information service provider (that is, the IXCs can provide information services).  The FCC has long recognized that IXCs can provide information (or before 1996, enhanced) services.[1]  And in line

---

[1] *See, e.g.*, *In Re Policy & Rules Concerning Interstate, Interexchange Marketplace*, 16 F.C.C. Rcd. 7418, 7442 (¶ 40) (F.C.C. 2001) ("[C]arriers not subject to the separate subsidiary requirement [the Bell Operating Companies] acquire transmission capacity pursuant to the same prices, terms, and conditions reflected in their tariffs when their own facilities are used, does not prohibit them from offering packages of telecommunications service, including interstate, domestic, interexchange service or local exchange service, and enhanced services at a single price."); *Policy & Rules Concerning the Interstate, Interexchange Marketplace Implementation of Section 254(g) of the Commc'ns Act of 1934*, 13 F.C.C. Rcd. 21531, 21552 (¶ 39) (F.C.C. 1998) ("We seek comment on whether there are any anticompetitive effects of allowing nondominant interexchange carriers to bundle, or provide discounts on packages of, enhanced services and interstate, domestic, interexchange services, when such services, in turn, are packaged with local exchange services."); *Policies & Rules Implementing the Tel. Disclosure & Dispute Resolution Act*, 8 F.C.C. Rcd. 6885, 6892 n. 62 (¶ 40) (F.C.C. 1993) ("We also note that an IXC who is also an IP [information provider] may not tariff the charge for the information service, as this would violate the prohibition against an IXC tariffing its enhanced services."); *Mountain States Tel. & Tel. Co., Nw. Bell Tel. Co., Pac. Nw. Bell Tel. Co. Petition for Waiver of Section 64.702 of the Comm'n's Rules & Regulations to Provide Protocol Conversion as an Adjunct to a Basic Packet Switched Network*, 3 F.C.C. Rcd. 3135, 3137 (¶ 11) (F.C.C. 1988) ("[I]f an interexchange carrier also provides an enhanced service in conjunction with packet switching, it would be afforded the protections established in the Protocol Waiver Order the same as any other competitive enhanced packet service provider."); *Pleading Cycle Established for Comments on Amendment to Bellsouth's Plan for Comparably Efficient Interconnection for Voice Messaging Servs.*, 3 F.C.C. Rcd. 5584, 5584 (¶ 2) (F.C.C. 1988) ("These network services will be made available to all local exchange

with those precedents, the FCC has specifically noted that Sprint offers information services. *Policies & Rules Implementing the Tel. Disclosure & Dispute Resolution Act*, 9 F.C.C. Rcd. 6891, 6893 (¶ 14) (F.C.C. 1994); *Application for Consent to Assignment of Licenses & Transfer of Control of Certain Subsidiaries of GTE Corp. & United Telecomms., Inc. to U.S. Sprint Commc'ns Co.*, 1752-CF-AL-(534)-86, 1986 WL 291870, at \*4 (F.C.C. June 18, 1986).

Second, when an IXC offers information services, it benefits from the ESP exemption. 47 C.F.R. § 69.5 ("Carrier's carrier charges shall be computed and assessed upon all interexchange carriers that use local exchange switching facilities for the provision of interstate or foreign *telecommunications services*." (emphasis added)); *Petition for Declaratory Ruling That AT&T's Phone-to-Phone IP Telephony Servs. are Exempt from Access Charges ("IP in the Middle")*, 19 F.C.C. Rcd. 7457, 7465 (¶ 14) (F.C.C. 2004) ("Under our rules, access charges are assessed on interexchange carriers that use local exchange switching facilities for the provision of *interstate or foreign telecommunications services*." (emphasis added)). Indeed, the FCC expressly rejected the majority opinion's view that the ESP exemption cannot benefit IXCs. *See In the Matters of Nw. Bell Tel. Co. Petition for Declaratory Ruling & Wats Related & Other Amendments of Part 69 of the Comm'n's Rules.*, 7 F.C.C. Rcd. 5644, 5645 (¶ 5) (F.C.C. 1992) ("*Nw. Bell Tel.*"); *In the Matter of Wats Related & Other Amendments of Part 69 of the Comm'n's Rules*, 3 F.C.C. Rcd. 496, 497 (¶ 10) (F.C.C. 1988). The FCC explained:

---

customers on an optional basis, including interexchange carriers using those facilities to provide enhanced services."); *see also United States v. GTE Corp.*, 603 F. Supp. 730, 733 (D.D.C. 1984) ("The decree in this case, by contrast, permits GTE to enter the interexchange business (by acquiring  Sprint) and to remain in the information services business even though it will also continue to engage in the local telephone business.").

No. 16-30634

> [A commenter] argues that this Commission exempted enhanced service providers, rather than enhanced services, from interstate access charges and that [an IXC] should not receive an access charge exemption even when it is offering enhanced services. This argument misconstrues our rules. Under those rules entities that offer both interexchange services and enhanced services are treated as carriers with respect to the former offerings, but not with respect to the latter. Thus, interexchange carriers . . . are eligible for an interstate access charge exemption for their enhanced service offerings. Although the access charge orders refer to "enhanced service providers," we have never limited that category to entities that provide only enhanced services. Rather, any entity that actually provides enhanced services should be treated as an "enhanced service provider," regardless of any other services that entity might provide.

*Nw. Bell Tel.*, 7 F.C.C. Rcd. at 5645 (¶ 5). And the FCC's decision that an IXC providing information services can be regulated like an information service provider is consistent with both the FCC's and the courts' longstanding view that "one can be a common carrier with regard to some activities but not others." *Nat'l Ass'n of Regulatory Util. Comm'rs v. F.C.C.*, 533 F.2d 601, 608 (D.C. Cir. 1976); *accord Verizon v. F.C.C.*, 740 F.3d 623, 653 (D.C. Cir. 2014); *Cellco P'ship v. F.C.C.*, 700 F.3d 534, 538 (D.C. Cir. 2012); *In the Matters of Amendment of Sections 64.702 of the Comm'n's Rules & Regulations (Third Comput. Inquiry)*, 2 F.C.C. Rcd. 3035, 3060–61 (¶ 179) (F.C.C. 1987), *vacated and remanded on other grounds sub nom. California v. F.C.C.*, 905 F.2d 1217 (9th Cir. 1990).

These twin errors result in the majority opinion's adopting a rule of decision that has never been blessed by either the FCC or another court. Every other case or administrative decision to decide whether a VoIP service provider

No. 16-30634

was required to pay tariff rates or rates pursuant to the ESP exemption focused on the specifics of the VoIP service at issue to determine whether it was an information service or a telecommunication.[2] The majority opinion is alone in focusing on whether the VoIP provider happens to be an IXC. Indeed, even the Comprehensive Reform Order, the only authority the majority cites, indicates that determining which payment regime governs VoIP services depends on the "*particular traffic* exchanged between a LEC and interexchange carriers and information service providers." Comp. Reform Order, 26 F.C.C. Rcd. 17,663, 18,015 (¶ 956) (F.C.C. 2011) (emphasis added) (quotations and citations omitted).

Moreover, the majority opinion's justification for its unique approach is thin. The majority opinion exclusively relies on one paragraph of the Comprehensive Reform Order, paragraph 957, which provides:

> [T]o the extent that interexchange VoIP services are transmitted to the LEC directly from an information service provider, such traffic is subject to pre-1996 Act obligations regarding "exchange access," although the access charges imposed on information service providers were different from those paid by IXCs. Specifically, under the ESP exemption, rather than paying intercarrier access charges, information service providers were permitted to purchase access to the exchange as end users, either by purchasing special access services or "pay[ing] local business rates and interstate subscriber line charges for their

---

[2] *See, e.g.*, *Charter Advanced Servs. (MN), LLC v. Lange*, 15-cv-3935 (SRN/KMM), 2017 WL 1901414, at *5 (D. Minn. May 8, 2017); *PAETEC Commc'ns, Inc. v. CommPartners, LLC*, No. 08-0397(JR), 2010 WL 1767193, at *3 (D.D.C. Feb. 18, 2010); *Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n*, 461 F. Supp. 2d 1055, 1082 (E.D. Mo. 2006), *aff'd*, 530 F.3d 676 (8th Cir. 2008); *Vonage Holdings Corp. v. Minn. Pub. Utils. Comm'n*, 290 F. Supp. 2d 993, 999 (D. Minn. 2003); *IP in the Middle*, 19 F.C.C. Rcd. at 7465–66 (¶¶ 12–14); *Petition for Declaratory Ruling (Pulver)*, 19 F.C.C. Rcd. 3307, 3314 (¶¶ 12–14) (F.C.C. 2004); *Fed.-State Joint Bd. on Universal Serv.*, 13 F.C.C. Rcd. 11501, at * 28 (¶¶ 86–88) (F.C.C. 1998).

switched    access    connections    to    local    exchange
company central offices."

Comp. Reform Order, 26 F.C.C. Rcd. at 18,015–16 (¶ 957). The majority
opinion seizes on paragraph 957's statement that IXCs paid different exchange
access rates than information service providers. In doing so, the majority
opinion ignores the longstanding FCC authority that permitted IXCs to benefit
from the ESP exemption when they provided information services (that is,
acted as information service providers). Nothing in Paragraph 957 was
intended to depart from this settled rule. On its face, Paragraph 957 is a
historical description of the pre-1996 regulatory regime, not an announcement
of a new regulatory policy. Accordingly, in my view, the better reading of
Paragraph 957 is that it accurately described the established regulatory
regime: IXCs paid tariff access charges when they acted as IXCs and paid the
ESP exemption rate when they acted as information service providers.

And unfortunately, the majority opinion's interpretation is not costless;
it contravenes the FCC's policy decisions. Providing the ESP exemption to only
non-IXCs "raise[s] questions of discrimination and would bestow an unfair
advantage on non-carrier competitors." *Nw. Bell Tel.*, 7 F.C.C. Rcd. at 5645
(¶5). For this reason the FCC has been careful to ensure that its decisions
classifying VoIP services do not place IXCs at competitive disadvantages. *See
IP in the Middle*, 19 F.C.C. Rcd. at 7469–70 (¶ 19) ("Commenters argue that it
is inequitable to impose access charges on AT&T's specific service if access
charges do not apply to other types of IP-enabled voice services. The
Commission is sensitive to the concern that disparate treatment of voice
services that both use IP technology and interconnect with the PSTN could
have competitive implications. . . . [O]ur ruling here should not place AT&T at

a competitive disadvantage.").

Consequently, I would remand to the district court to determine whether the VoIP calls here are information services or telecommunications. The district court did not reach the issue, holding instead that because Sprint owed CenturyLink access charges regardless of whether the VoIP calls were a telecommunications or an information service, Sprint was required to pay CenturyLink's tariffs. I believe that this district court's holding is also erroneous.

Under Section 251(g) Sprint was required to pay CenturyLink in accordance with pre-1996 law. The district court correctly found that before 1996, Sprint owed CenturyLink access charges regardless of whether Sprint was providing telecommunications or information services. Comp. Reform Order, 26 F.C.C. Rcd. at 18,015–16 (¶ 957) ("Regardless of whether particular VoIP services are telecommunications services or information services, there are pre-1996 Act obligations regarding LECs' compensation for the provision of exchange access to an IXC or an information service provider."). But the district court erred in concluding that the access charge Sprint owed must have been the tariffed rate. Instead, if the VoIP calls are information services, Sprint's access charge would be an end user rate set pursuant to the ESP exemption. *Id.* at 18,016 (¶ 957) ("Similarly, to the extent that interexchange VoIP services are transmitted to the LEC directly from an information service provider, such traffic is subject to pre-1996 Act obligations regarding 'exchange access,' *although the access charges imposed on information service providers were different from those paid by IXCs.* Specifically, under the ESP exemption, rather than paying intercarrier access charges, *information service providers were permitted to purchase access to the exchange as end users*, either by purchasing special access services or 'pay[ing] local business rates and

interstate subscriber line charges for their switched access connections to local exchange company central offices.'"(emphases added)).

This error is understandable.  The FCC "at times has used the term 'access charges' colloquially as synonymous with carrier's carrier access charges [charges at the telecommunications rate], notwithstanding the fact that access charges actually encompass a broader category of charges." *Id.* at 18,016 n.1961.  However, properly understood, "access charge" refers to both the tariff rate IXCs pay to LECs and the end user rate that subscribers pay to LECs (including entities that pay a subscriber rate under the ESP exemption). *See, e.g., id.* at 18,015–16 (¶ 957); *Petitions of Qwest Corp. for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Denver, Minneapolis-St. Paul, Phx., & Seattle Metro. Statistical Areas*, 23 F.C.C. Rcd. 11729, 11748 (¶ 25) (F.C.C. 2008); *Deployment of Wireline Services Offering*, 15 F.C.C. Rcd. 385, 406 (¶ 45) (F.C.C. 1999), *vacated in part on other grounds sub nom. WorldCom, Inc. v. F.C.C.*, 246 F.3d 690 (D.C. Cir. 2001); *Mts & Wats Mkt. Structure*, 93 F.C.C.2d 241, 250 (¶ 23) (F.C.C. 1983).

The district court failed to determine whether Sprint was required to pay CenturyLink's tariffs or end user access charges under the ESP exemption. Because this determination governs the rates that Sprint owed to CenturyLink, I would vacate the district court's conclusion as to the federal tariff claim and remand to the district court.  Likewise, because the district court's Section 201(b) ruling is contingent on a federal law violation, I would vacate and remand that claim as well.

I respectfully dissent in part.